OPINION OF THE JUSTICES TO THE SENATE.

*Massachusetts Port Authority. Constitutional Law,* Public corporation,
   Public purpose, Money received on account of the Commonwealth,
   Corporate charter, Due process of law, Obligation of contracts, Bor-
   rowing by the Commonwealth, Executive and administrative work of
   the Commonwealth, Taxation, Expenditure of public money, Giving
   or lending credit of the Commonwealth, Delegation of powers, Refer-
   endum. *Corporation,* Public corporation, Massachusetts Port Au-
   thority, Charter. *Contract,* What constitutes, Corporate charter,
   Contract with Commonwealth. *Commonwealth,* Contracts, Financial
   matters. *Taxation,* Real estate tax: exemption; Personal property
   tax: exemption; Income tax.

The Massachusetts Port Authority, if created by proposed legislation as
   a "body politic and corporate" and "a public instrumentality" hav-
   ing only members appointed by the Governor with the advice and
   consent of the Council and performing "an essential governmental
   function" with respect to the acquisition and operation of certain
   facilities for public travel, and empowered to sue and be sued and
   acquire property in its own name, to make contracts, and to issue
   bonds, would be a public corporation entrusted with some of the
   powers of the Commonwealth for public purposes, and yet would be
   an entity in itself distinct from the Commonwealth although nomi-
   nally placed in the department of public works. [733–734]
Proposed legislation providing that money received by the Massachu-
   setts Port Authority, created thereunder as a public corporation for
   public purposes but constituting an entity in itself distinct from the
   Commonwealth, should not be paid into the treasury of the Common-
   wealth would not violate § 1 of art. 63 of the Amendments to the
   Constitution since the money would be received by the Authority on
   its own account and not "on account of" the Commonwealth. [734]
Proposed legislation creating the Massachusetts Port Authority as a
   public corporation and conferring on it powers respecting the acquisi-
   tion and operation of certain facilities for public travel would, if en-
   acted, be an act of incorporation, but, whether because of art. 59 of
   the Amendments to the Constitution or apart from art. 59, would be
   subject to revocation and amendment by subsequent legislation such
   as would not defeat or substantially impair without compensation
   rights vested under the act. [735–738]
If the General Court should enact proposed legislation creating the
   Massachusetts Port Authority and empowering it to issue bonds to
   provide funds for its purposes and subsequently the General Court
   should revoke that legislation, the Commonwealth would not be bound
   by contract to the bondholders to continue the powers of the Author-
   ity in a successor until provision for payment of all the bonds should

have been made; nor would the Commonwealth be liable in damages to the bondholders by reason of the revocation since it either would be valid as against them or, if it unconstitutionally affected their rights, would be void as against them.  [738]

The issuance of revenue bonds by the Massachusetts Port Authority under the powers to be conferred by proposed legislation creating the Authority as a public corporate entity distinct from the Commonwealth and providing that such bonds should "not be deemed to constitute a debt of" the Commonwealth or "a pledge of . . . [its] faith and credit" would not constitute a borrowing of money by the Commonwealth within art. 62, § 3, of the Amendments to the Constitution.  [738]

If proposed legislation creating the Massachusetts Port Authority as a corporate entity distinct from the Commonwealth and authorizing the Authority to issue revenue bonds were enacted, the Commonwealth would not become contractually bound to the bondholders to see that revenues received by the Authority were properly applied as provided in the legislation, notwithstanding a statement required to be on the face of the bonds that neither the Authority nor the Commonwealth should be obligated for the payment of the principal or the interest thereof "except from revenues."  [729, 738]

The Massachusetts Port Authority, if created by proposed legislation as a public corporation in its own right and not as part of the machinery of the government and "placed" in the department of public works, although not subject to the supervision or regulation thereof, would not be an executive or administrative office, board or commission within the scope of art. 66 of the Amendments to the Constitution.  [739]

Proposed legislation creating the Massachusetts Port Authority as a public corporation for the public purpose of acquiring and operating certain facilities for public travel, would be constitutional in granting tax exemptions respecting the property acquired or used by the Authority and the income therefrom and revenue bonds to be issued by the Authority, their transfer and the income therefrom, including any profit made on the sale thereof.  [739-740]

Proposed legislation creating the Massachusetts Port Authority and empowering it to take over, finance and operate the Sumner tunnel would not unconstitutionally impair certain provisions of St. 1929, c. 297, as amended, pertaining to tunnel bonds issued by the city of Boston if the bondholders would be as secure under the proposed legislation as under the 1929 statute.  [740-741]

Proposed legislation creating the Massachusetts Port Authority and empowering it to take over, finance and operate the Mystic River Bridge, among other properties, and to fix tolls would not unconstitutionally impair the provision of St. 1946, c. 562, § 15, that the bridge be operated free of tolls after provision should have been made for retirement of bonds, of the Mystic River Bridge Authority.  [730, 741]

The Commonwealth could constitutionally undertake to pay retirement allowances of retired employees of the Massachusetts Port Authority

in accordance with proposed legislation creating the Authority as a public corporation for public purposes and providing that the Commonwealth should be reimbursed by the Authority for such payments. [730, 741]

If proposed legislation creating the Massachusetts Port Authority as a public corporation for public purposes were enacted, an appropriation of money from the General Fund of the Commonwealth for a loan to the Authority would not be in violation of art. 62, § 1, of the Amendments to the Constitution. [731, 742]

Proposed legislation creating the Massachusetts Port Authority would not be unconstitutional as an improper delegation of legislative power with respect to provisions outlining the nature of and imposing some express limitations on a trust agreement to be entered into by the Authority and a trustee to secure bonds issued by the Authority, although leaving many of the terms of the agreement to be determined by the Authority. [743]

The character and extent of the services and facilities for public travel to be furnished, constructed, operated and maintained by the proposed Massachusetts Port Authority for an indefinite time would not so vitally affect the welfare of the port of Boston and of the general public that the General Court could not surrender its power to regulate them to the Authority by legislation subject to revocation and amendment. [733, 743]

Proposed legislation creating the Massachusetts Port Authority to take over, finance and operate the Sumner tunnel between Boston proper and East Boston, the State owned airports at East Boston and Bedford, the Mystic River Bridge, and piers and harbor facilities in the port of Boston, and to finance, construct and operate an additional crossing by bridge or tunnel between Boston proper and East Boston, and appropriating money for the expenses of the Authority later to be reimbursed by it, would be restricted in its operation to "a particular town, city or other political division or to particular districts or localities of the commonwealth" and would be one of the "Excluded Matters" described in art. 48 of the Amendments to the Constitution, The Referendum, III, § 2, and would not be subject to the referendum. [733, 743]

On June 19, 1956, the Justices submitted the following answers to questions propounded to them by the Senate.

To the Honorable Senate of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit these answers to questions set forth in an order of the Senate dated May 16, 1956, and transmitted to us on May 24.

The questions relate to a pending bill creating the Massachusetts Port Authority, hereinafter called the Authority, to take over, finance, and operate the existing East Boston vehicular tunnel, known as the Sumner tunnel, the State owned airports at East Boston and Bedford, the Mystic River Bridge, and the "port properties," consisting of piers and harbor facilities, and to finance, construct, and operate an additional crossing by bridge or tunnel between Boston proper and East Boston.

The bill comprises thirty closely printed pages, including in § 1 about five pages of definitions of the terms employed. We shall attempt to summarize only the portions of the bill that seem directly involved in the questions asked.

The Authority is to be "placed in the department of public works," but "shall not be subject to the supervision or regulation of the department of public works or of any department, commission, board, bureau or agency of the commonwealth except to the extent and in the manner provided in this act." It is described as "a body politic and corporate." It is "constituted a public instrumentality and the exercise by the Authority of the powers conferred by this act shall be deemed and held to be the performance of an essential governmental function." The Authority is to consist of seven members appointed by the Governor with the advice and consent of the Council for terms of seven years, with provision for staggered terms and for removal of members by the Governor with the advice and consent of the Council for certain causes mentioned. § 2.

Among the powers granted to the Authority by § 3 are these:

To adopt by-laws for the regulation of its affairs and the conduct of its business, and to fix penalties not in excess of $100 for violation thereof.

To adopt an official seal.

To sue and be sued in its own name.

To extend, enlarge, improve, rehabilitate, lease as lessor or as lessee, maintain, repair, and operate the projects under its control, and to establish rules and regulations for the

use of any such projects, subject to exceptions as to the operation of aircraft and the powers of police officers not here material.

To issue its revenue bonds, payable solely from revenues.

To fix and to revise tolls, rates, fees, rentals, and other charges for the use of any project under its control, with certain qualifications not material here.

"To acquire, hold and dispose of real and personal property in the exercise of its powers and the performance of its duties under this act."

"To acquire in its own name by purchase or otherwise, on such terms and conditions and in such manner as it may deem proper, or by the exercise of the power of eminent domain . . . such public or private lands . . . as it may deem necessary for carrying out the provisions of this act; provided, that the Authority shall act in its name and on its behalf in exercising its functions under this clause . . .."

To apply for and receive Federal grants.

"To make and enter into all contracts and agreements necessary or incidental to the performance of its duties . . .."

Section 4 contains further power to acquire property by purchase "and to take title thereto in the name of the Authority," and to acquire "in its own name by purchase or otherwise" or to take by eminent domain real estate. Provision is made for the relocation or removal of tracks and public utilities.

"Title to the airport properties shall be vested in the Authority," and possession shall be transferred to it upon the payment to the treasurer of the Commonwealth of the aggregate principal amount of certain bonds of the Commonwealth issued under certain previous enactments and of a sum equal to the aggregate cash payments under certain other previous acts. § 5.

"[T]itle to the port properties shall be vested in the Authority" and possession shall be transferred to it upon the issue of revenue bonds and the application of their proceeds under § 8, certain payments being made to the treasurer of the Commonwealth until there shall have been

paid a sum equal to payments previously made by the Commonwealth under certain statutes and to the principal outstanding amounts of certain bonds of the Commonwealth issued under certain enumerated statutes, and interest thereon after the transfer. § 6.

By § 8 the Authority is given power to issue "revenue bonds of the Authority" to provide funds for refunding the Mystic River Bridge revenue bonds, paying to the city of Boston $2,619,380 heretofore paid by the city for operating deficits of the Sumner tunnel, paying to the city $5,300,000, "determined to be the amount," in addition to the amount of other sums mentioned, "due the city in payment of just compensation for the tunnel," paying to the commissioners of sinking funds of the city the principal of outstanding tunnel bonds, paying the cost of the additional crossing, making the required payments to the treasurer of the Commonwealth for the airport properties, and making some other payments that need not be detailed here. This section further provides that the payments to the city of Boston and its sinking fund commissioners for the Sumner tunnel shall be presumed to constitute just compensation for the tunnel, if accepted or not rejected by vote of the city council within sixty days after the effective date of the act.

"The principal of and the interest on all bonds issued under the provisions of this act shall be payable solely from the funds provided therefor from revenues as herein provided." § 10. The bonds "shall not be deemed to constitute a debt of the commonwealth or of any political subdivision thereof or a pledge of the faith and credit of the commonwealth or of any such political subdivision, but such bonds shall be payable solely from the funds herein provided therefor from revenues." § 11.

The bonds are to be "secured" by a trust agreement between the Authority and a corporate trustee with which the proceeds of the bonds shall be deposited and which shall make the payments hereinbefore mentioned. Subject to qualifications the trust agreement may pledge or assign the tolls and other revenues. § 12.

Upon the issuance of revenue bonds and the application of the proceeds as provided in § 8 "title to the Mystic River bridge and to the Sumner tunnel shall be vested in the Authority," and "said bridge and tunnel shall thereafter be maintained, repaired and operated by the Authority . . . ." § 13.

The Authority is authorized to fix tolls, rates, fees, rentals and other charges, to be so fixed and adjusted as to provide a fund sufficient to pay current expenses, to meet sinking fund requirements for the outstanding tunnel bonds, to pay the principal and interest on all bonds to be issued under the act and for certain other payments mentioned in the act. "Such tolls, rates, fees, rentals and other charges shall not be subject to supervision or regulation by any department, division, commission, board, bureau or agency of the commonwealth or any political subdivision thereof." . § 14.

All moneys received pursuant to the authority of the act shall be deemed trust funds to be held and applied solely as provided in the act. § 15.

The Authority shall not be required to pay any taxes or assessments upon any property acquired or used under the act or upon income therefrom, and the bonds issued under the act, their transfer, and the income therefrom, including profit on sale thereof, are to be free from taxation within the Commonwealth, with certain qualifications as to lands of the Authority leased for business purposes. § 17.

Under the heading "Freedom from Competition" are provisions that so long as any bonds issued under the act are outstanding no bridge, tunnel, or ferry for vehicular traffic shall be constructed within certain limits by the Commonwealth or any political subdivision thereof or by any public instrumentality other than the Authority and no franchise shall be granted for any bridge, tunnel or ferry for such traffic. § 20.

The Authority is to be liable for injury or death by reason of defects or want of repair of its ways to the same extent as a municipal corporation would be liable. § 23.

When all payments due under § 6 shall have been made

and all bonds issued under the act and interest thereon have been paid or a sufficient amount in trust has been set aside therefor, all projects under the control of the Authority "shall be operated and maintained in such manner as may be provided by the general court." § 25.

The questions are as follows:

"1. Would the proposed bill, if enacted, be in violation of the first section of the Sixty-third Article of Amendment to the Constitution in that it provides that the bulk of funds and revenues of the authority, a 'body politic and corporate' performing an 'essential governmental function' (Sec. 2), shall not be paid into the state treasury?

"2. Is Section 2 of the bill establishing the Massachusetts Port Authority as 'a body politic and corporate' an 'act of incorporation' within the meaning of Article 59 of the Amendments to the Constitution?

"3. If Section 2 is an act of incorporation, does it violate Article 59 of the Amendments as not being 'subject to revocation or amendment' until provision is made for retirement of all bonds issued by the authority, particularly in view of Section 20 of the bill?

"4. If the 'act of incorporation' is subject to revocation or amendment at any time, is the Commonwealth bound by contract as against purchasers of bonds of the authority, to continue the powers granted the authority by this bill in a successor corporation or person until provision for payment of all such bonds has been made?

"5. If the answer to question No. 4 is 'Yes', is the said contract in violation of Article 59?

"6. If the answer to question No. 4 is 'Yes', will the Commonwealth, upon revocation of the incorporation of the authority prior to provision for payment of all bonds issued by the authority, become liable in damage to the bondholders if it fails to continue the powers created by the bill in another person or corporation?

"7. If the answer to question No. 6 is in the affirmative, does the authorization and issuance of bonds by the

authority under the terms of this bill constitute a borrowing of money by the Commonwealth under Section 3 of Article 62 of the Amendments to the Constitution, requiring a two-thirds vote of the General Court?

"8. Is the grant to the authority of the power to own, operate and fix and collect tolls and charges for use of the Mystic River Bridge, the Sumner Tunnel, the 'additional facility', or any of them, a 'franchise' within the meaning of Article 59 of the Amendments?

"9. By the terms of the bill, if enacted, is such grant irrevocable and indestructible until provision has been made for payment of all bonds issued by the Authority?

"10. If the answer to questions 8 and 9 are in the affirmative, does the bill violate Article 59 of the Amendments in creating a 'franchise' not 'subject to revocation'?

"11. If the answer to question 8 is in the affirmative, and to question 9 in the negative, does the Commonwealth, by the terms of the bill, bind itself contractually not to revoke said franchise until provision is made for payment of all bonds issued by the authority?

"12. If the answer to question 11 is in the affirmative, does the said obligation violate Article 59 of the Amendments?

"13. Will the Commonwealth, if the General Court revokes the grant referred to in question 8 prior to provision for payment of all bonds, become liable in damages to the bondholders?

"14. Apart from the matters considered in questions 2–13 inclusive, does the Commonwealth become contractually bound to the bondholders to see that the revenues provided by the act are properly applied as provided in the act, particularly in view of the language of the last sentence of the first paragraph of section 11?[1]

---

[1] This sentence reads: "All such revenue bonds shall contain on the face thereof a statement to the effect that neither the Authority nor the commonwealth nor any political subdivision thereof shall be obligated to pay the same or the interest thereon except from revenues and that neither the faith and credit nor the taxing power of the commonwealth or any political subdivision thereof is pledged to the payment of the principal of or the interest on such bonds." — REPORTER.

"15. If the answer to question 13 or question 14 is in the affirmative, does the authorization and issuance of bonds by the authority under the terms of this bill constitute a borrowing of money by the Commonwealth under Section 3 of Article 62 of the Amendments, requiring a two-thirds vote of the General Court?

"16. Does the provision in Section 2 that the authority 'shall not be subject to the supervision or regulation of the Department of Public Works or of any department, commission, board, bureau or agency of the Commonwealth except to the extent and in the manner provided in this act' violate Article 66 of the Amendments?

"17. Is it constitutionally competent for the General Court to grant the tax exemptions provided in Section 17 of the bill (A) with respect to the revenue bonds to be issued by the authority, (B) with respect to the physical property of the authority, (C) with respect to the physical property of the authority leased to commercial users?

"18. Will the bill, if enacted, unconstitutionally impair the provision of St. 1929, c. 297, s. 12, with respect to the toll to be charged for use of the Sumner Tunnel after adequate provision has been made for retirement of debt and reimbursement of the city of Boston?

"19. Will the bill, if enacted, unconstitutionally impair the provision of St. 1946, c. 562, s. 15, that the Mystic River Bridge be operated free of tolls, after provision has been made for retirement of bonds of the Mystic River Bridge Authority?

"20. May the Commonwealth constitutionally undertake to pay retirement allowances of retired employees of the authority subject to being reimbursed by the authority as provided in Section 22 of the bill?

"21. Would the provisions of said section one of said bill, if enacted into law, be violative of Article XIV of the Amendments to the Constitution of the United States?

"22. Would said bill if enacted into law be violative of section 10 of Article I of the Constitution of the United States?

"23. If said proposed bill were enacted into law would the Massachusetts Port Authority, as described in section two and empowered as set forth in sections three and fourteen, constitute a public authority or a private authority?

"24. If the said bill were enacted into law, would the authorization to the Massachusetts Port Authority to issue bonds be subject to the provisions of section 3 of Article LXII of the Amendments to the Constitution of the Commonwealth, and require a vote, taken by the yeas and nays, of two-thirds of each house of the General Court present and voting thereon?

"25. If the proposed bill were enacted into law, would the appropriation of seven hundred and fifty thousand dollars from the General Fund of the Commonwealth for a loan to the Massachusetts Port Authority, be in violation of section 1 of Article LXII of the Amendments to the Constitution of the Commonwealth?

"26. If the proposed bill were enacted into law would the provisions of section ten relative to the bond issuing power of the Massachusetts Port Authority, and providing that bonds may be issued by the Authority under the proposed law 'without obtaining the consent of any department, division, commission, board, bureau, or agency of the Commonwealth or the city, and without any other proceedings or the happening of any other conditions or things other than those proceedings, conditions or things which are specifically required under this act' be subject to revocation and amendment by the General Court under the provisions of Article LIX of the Amendments to the Constitution?

"27. If the proposed bill were enacted into law would the provisions of section twenty which free the Massachusetts Port Authority from competition and provide that 'so long as any bonds issued under the provisions of this act shall be outstanding, no bridge, tunnel or ferry for vehicular traffic shall be constructed by the Commonwealth or any political subdivisions thereof or by any

public instrumentality other than the said Authority, and no franchise shall be granted for the construction or operation of a bridge, tunnel or ferry for vehicular traffic over, under or across Boston harbor or the Mystic river, within a distance of one mile from the center line of the Sumner tunnel or the additional crossing or the Mystic river bridge, excepting, however, those waters lying west of the location of the Charlestown bridge now connecting Boston and Charlestown' constitute a franchise which would be subject to revocation and amendment by the General Court under the provisions of Article LIX of the Amendments to the Constitution?

"28. If the proposed bill were enacted into law would the creation of the said Massachusetts Port Authority constitute an act of incorporation within the meaning of Article LIX of the Amendments to the Constitution?

"29. If the said bill is enacted into law, and bonds of said authority are issued and sold, would the enactment of subsequent legislation by the General Court varying the provisions of said bill relative to the management and operation of the Massachusetts Port Authority, or altering the provisions of section three, or altering the provisions of section twenty of said bill regulating construction and operation of bridges, tunnels and ferries for vehicular traffic, or authorizing construction or the making of contracts or leases otherwise than in accordance with said section twenty, constitute a violation of section 10 of Article I of the Constitution of the United States?

"30. If said bill is enacted into law and bonds of the Massachusetts Port Authority are issued and sold as aforesaid, would it be constitutionally competent for the General Court to enact any such subsequent legislation?

"31. If said bill is enacted into law would the enforcement by the Massachusetts Port Authority not only of all rights granted it under the laws of the Commonwealth and set forth in the act, but also of any and all rights granted it under a trust agreement, not yet in existence,

be unconstitutional in that it would be a grant and surrender of legislative powers?

"32. If the said bill is enacted into law would the provisions of the trust agreement provided for therein, which may include any provisions therein, and allows the expenditure of money by the Authority for purposes not specified, and the terms of which shall be law regardless of any other statute or future legislative control, be a complete surrender of the powers of the legislature, and therefore unconstitutional?

"33. Is the character and extent of the services and facilities to be furnished, constructed, operated and maintained by the Massachusetts Port Authority for a period of time indefinite in length, a matter so vitally affecting the welfare of the port of Boston and of the general public that their regulation as provided in the pending bill cannot be surrendered by the General Court?

"34. If said bill is enacted into law would it be subject to the referendum provisions of Article XLVIII of the Amendments to the Constitution of the Commonwealth?"

It seems desirable at the beginning to inquire what sort of body the Authority will be. It is "placed" in the department of public works, but only nominally so, since it is not to be subject to supervision or regulation in the ordinary sense of that or of any other department. § 2. Yet it is constituted "a public instrumentality," and the exercise of its powers "shall be deemed and held to be the performance of an essential governmental function," and this provision is consistent with the nature of the Authority's powers and duties in relation to airports, wharves, tunnels, and bridges, all of which have to do with the establishment and maintenance of means of public travel. Clearly these are matters of public concern. The further duties of investigation and report contained in § 3 (f) and not hereinbefore summarized are largely incidental to the other duties and in any event do not detract from the public character of the Authority. On the other hand, there are other pro-

visions that indicate strongly that the Authority is not merely a board or commission of the State government. It is to sue and be sued in its own name. § 3 (d). It is to acquire property in its own name, the title to which is to be in it and not in the Commonwealth. § 3 (j), (k); §§ 4, 5, 6, 13. It is to make contracts (§ 3 [o]) and to issue bonds (§ 8) which shall not be the bonds of the Commonwealth. § 11. It seems therefore that the Authority must constitute an entity in itself and must have an existence apart and distinct from that of the Commonwealth. *Johnson-Foster Co.* v. *D'Amore Construction Co.* 314 Mass. 416, 419. *Opinion of the Justices,* 322 Mass. 745, 751–753. In substance it has many important attributes of a corporation, and nothing other than a corporation would seem to satisfy the requirements of its being. But it is in no sense a private or business corporation. Its members are to be appointed by the Governor with the advice and consent of the Council. It has no stockholders. No person can derive a profit through its operations. Only the public is to be benefited. The Authority therefore bears considerable analogy to a municipal corporation, although it can hardly be said to possess a territory of its own, and it exercises only limited governmental powers. It is described in § 2 as "a body politic and corporate." This expression is frequently used in city charters and is appropriate to a corporation to which is entrusted some of the powers of the State for public purposes. In our opinion the Authority would be a corporation of that character. See *Opinion of the Justices,* 330 Mass. 713. The answers to the questions will be based upon that premise.

Question 1 presents no great difficulty. Article 63, § 1, of the Amendments to the Constitution referred to in the question provides that all money "received on account of the commonwealth from any source whatsoever shall be paid into the treasury thereof." In our opinion money received by the Authority will be received on its own account and will not be "money received on account of the commonwealth." *Horton* v. *Attorney General,* 269 Mass.

503, 511–512. *Opinion of the Justices*, 271 Mass. 582, 592–594, 595. *Opinion of the Justices*, 322 Mass. 745, 751–753. See *Wyatt* v. *State Roads Commission*, 175 Md. 258, 269. Compare *Opinion of the Justices*, 309 Mass. 571, 578–582. We answer question 1 "No."

Questions 2 and 3 raise the point whether the pending bill is an act of incorporation within the meaning of art. 59 of the Amendments to the Constitution which reads, "Every charter, franchise or act of incorporation shall forever remain subject to revocation and amendment." Inasmuch as in our opinion the Massachusetts Port Authority to be established by the pending bill would be a corporation, we must conclude that, if enacted, the pending bill would be an act of incorporation. But it does not necessarily follow that it would violate art. 59. It was said of that article in *Opinion of the Justices*, 261 Mass. 523, at page 552, "The general design and effect of that amendment are to prevent a legislative act of granting a charter or franchise, or an act of incorporation remaining forever free from amendment under the contract clause of the Federal Constitution as interpreted by *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518. It may also have other bearings and results." If therefore the pending bill would create a contract between the Commonwealth and the Authority that would otherwise fall within the *Dartmouth College* decision, art. 59 would operate upon it and would render the act "subject to revocation and amendment." Conversely if no contract were created it might be that art. 59 would have no application, and the matter of revocation and amendment might depend upon the general powers of the Legislature without regard to art. 59. We incline to the view that art. 59 would not apply to the Authority. We regard the Authority as a purely public corporation for public purposes — an arm of the State — analogous to a municipal corporation. The debates in the Constitutional Convention of 1917–1918 relative to what is now art. 59 show a preoccupation with the control of privately owned public service corporations operated for profit and do not mention

corporations created for purposes of the State. Debates in Mass. Constitutional Convention, 1917–1918, Vol. 3, at pages 386–402. So far as we are aware it has never been supposed that grants of corporate powers and franchises of a public nature to municipal corporations created contracts within the *Dartmouth College* rule. Such grants and franchises have always been regarded as freely revocable and amendable. *Weymouth & Braintree Fire District* v. *County Commissioners of Norfolk*, 108 Mass. 142. *Coolidge* v. *Brookline*, 114 Mass. 592. *Commonwealth* v. *Plaisted*, 148 Mass. 375, 383–387. *Boston, petitioner*, 221 Mass. 468, 477–478. *Sullivan* v. *Lawson*, 267 Mass. 438, 439–440. *Broadhurst* v. *Fall River*, 278 Mass. 167, 170–171. *Commonwealth* v. *Hudson*, 315 Mass. 335, 345. *Mayor of Gloucester* v. *City Clerk of Gloucester*, 327 Mass. 460, 464. *Hunter* v. *Pittsburgh*, 207 U. S. 161, 178–179. *Trenton* v. *New Jersey*, 262 U. S. 182, 186–187. We are inclined to class the pending bill with city charters in respect to the legislative powers of revocation and amendment. The corporation with which the court was concerned in *Boston Elevated Railway* v. *Commonwealth*, 310 Mass. 528, at pages 548–551 (involving a statute antedating art. 59 of the Amendments), and the proposed corporation in *Opinion of the Justices*, 332 Mass. 769, were or were to be private corporations organized for profit and not instrumentalities of the State.

On the other hand it would be quite possible to read art. 59 very literally and to say that the object was to include all corporations in one comprehensive statement, even though they were of such nature that their charters and franchises created no contracts with the State and would have been revocable and amendable without the aid of art. 59.

It would seem to make little practical difference whether the pending bill would be subject to revocation and amendment because of art. 59 or as a public charter without the aid of that article. In our opinion it would be subject to revocation and amendment, and one Legislature cannot bind its successors not to revoke or amend it, if the public

interest seems to require a change. This statement applies to § 20 as well as to other parts of the pending bill. The features of § 20 purporting to grant exclusive privileges as long as any bonds are outstanding would be subject to revocation and amendment by succeeding Legislatures.

The power of revocation and amendment is not, however, without limits. Even in the case of a public corporation like the Authority where the granting of a charter or franchise creates no contract with the State, other constitutional limitations are applicable. Property cannot be taken without compensation or without due process of law. *Opinion of the Justices,* 300 Mass. 607, 612–613. One formula appearing in the authorities with reference to private corporations is that statutory changes may go at least to such extent as "will not defeat or substantially impair the object of the grant, or any rights which have vested under it." *Commissioners on Inland Fisheries* v. *Holyoke Water Power Co.* 104 Mass. 446, 451, affirmed sub nomine *Holyoke Co.* v. *Lyman,* 15 Wall. 500. *Opinion of the Justices,* 322 Mass. 755, 761–762. Other illustrative instances are afforded by *Commonwealth* v. *Essex Co.* 13 Gray, 239, 253, *Parker* v. *Metropolitan Railroad,* 109 Mass. 506, 508, *Woodward* v. *Central Vermont Railway,* 180 Mass. 599, 603–604, *Commonwealth* v. *Boston & Northern Street Railway,* 212 Mass. 82, 84–85, *Granara* v. *Italian Catholic Cemetery Association,* 218 Mass. 387, *Tapper* v. *Boston Chamber of Commerce,* 249 Mass. 235, 240–241, *Opinion of the Justices,* 323 Mass. 759, 762, *Coombes* v. *Getz,* 285 U. S. 434, *Phillips Petroleum Co.* v. *Jenkins,* 297 U. S. 629, 634–635, and *Black River Regulating District* v. *Adirondack League Club,* 307 N. Y. 475, 487–488. And see *Delaware & Hudson Co.* v. *Boston Railroad Holding Co.* 323 Mass. 282, 290–294. These limitations are real, although not exactly defined. It is not possible to define them further now, when we have no revocation or amendment before us. We can only refer to what has been previously said or decided.

In view of the foregoing discussion, we answer questions

2 and 3 that the pending bill would, if passed, be an act of incorporation, but that it would not violate art. 59 of the Amendments, although, quite apart from art. 59, it would be "subject to revocation and amendment" which would not defeat or substantially impair without compensation rights vested under the statute.

We answer question 4 "No." The Commonwealth would not be bound by contract to continue the powers granted. See, however, answer to questions 2 and 3. See *Proprietors of the Charles River Bridge* v. *Proprietors of the Warren Bridge*, 11 Pet. 420.

Question 5 appears to require no answer.

Question 6 appears by its terms to require no answer, but it seems proper to state that we do not see how the Commonwealth could become liable in damages. If a revocation should be in such circumstances as to be valid, there would be no ground for liability, and if a revocation were in such circumstances as to be unconstitutional it would be void.

Question 7 appears by its terms to require no answer. We may add, however, that the authorization and issuance of bonds by the Authority would not constitute a borrowing of money by the Commonwealth under art. 62, § 3, of the Amendments. See § 11 of the pending bill and *Opinion of the Justices*, 322 Mass. 745, 751–753.

Question 8 we answer "No" for the reasons previously stated in connection with questions 2 and 3.

Question 9 we answer "No." See the discussion above in relation to questions 2 and 3.

Questions 10, 11, and 12 do not seem to require separate answers.

Question 13 we answer "No." As stated in our answer to question 6, we do not see how the Commonwealth would become liable.

Question 14 we answer "No." There is nothing in the last sentence of the first paragraph of § 11 that should lead to a contrary conclusion. *New Jersey Turnpike Authority* v. *Parsons*, 3 N. J. 235, 243–244.

Question 15 requires no answer. See answer to question 7.

Question 16 raises the point whether the pending bill is constitutional in view of art. 66 of the Amendments, which requires that "every executive and administrative office, board and commission" shall be placed in one of the twenty departments into which "the executive and administrative work of the commonwealth" must be organized. Since we are of opinion that the Authority would be a corporation in its own right and not part of the machinery of the government, we think it would not be an executive or administrative office, board or commission within the scope of art. 66, even though by the pending bill it is "placed" in the department of public works but without being subject to the supervision or regulation of that department. § 2. This view is supported by *Opinion of the Justices*, 271 Mass. 582, 595. See *Opinion of the Justices*, 322 Mass. 745, 751–753. This provision is similar to that contained in St. 1946, c. 562, § 3, creating the Mystic River Bridge Authority, and to St. 1952, c. 354, § 3, creating the Massachusetts Turnpike Authority. See *Opinion of the Justices*, 330 Mass. 713.

Question 17 is answered "Yes" as to all three subdivisions (A), (B), and (C). The property of the corporation would be devoted to a public use. Such property, unless otherwise expressly provided, is exempt from taxation under many decisions of which we mention only a few. *Worcester* v. *Western Railroad*, 4 Met. 564. *Boston* v. *Boston & Albany Railroad*, 170 Mass. 95. *Milford Water Co.* v. *Hopkinton*, 192 Mass. 491. *Assessors of Boston* v. *Boston, Revere Beach & Lynn Railroad*, 319 Mass. 378. As to the exemptions of the income of the Authority, the Authority's bonds, and their transfer, and the income and profits from sales thereof, these, we think, are permissible exemptions in view of the facts that the issuance and sale of the bonds are necessary parts of the whole enterprise conceived and intended for the maintenance and extension of great improvements wholly for the public benefit. *Opin-*

*ion of the Justices,* 270 Mass. 593, 599.  *Assessors of Quincy*
v. *Cunningham Foundation,* 305 Mass. 411, 416–417.  *As-
sessors of West Springfield* v. *Eastern States Exposition,*
326 Mass. 167.  *Newhall* v. *Assessors of Brookline,* 329
Mass. 100.  And the fact that these exemptions apply to a
single corporation does not render them invalid.  *Massa-
chusetts General Hospital* v. *Belmont,* 233 Mass. 190, 203–
204.  The situations presented in *Opinion of the Justices,*
324 Mass. 724, and *Opinion of the Justices,* 332 Mass. 769,
are readily distinguishable, since in both instances the
exemptions related to private property privately owned.
Moreover, art. 44 of the Amendments contains, in respect
to the income tax, an express provision for "reasonable
exemptions."  As to leased properties see *Boston Fish
Market Corp.* v. *Boston,* 224 Mass. 31; *Dehydrating Process
Co. of Gloucester, Inc.* v. *Gloucester, ante,* 287.

With respect to question 18: Statute 1929, c. 297, § 12,
provides that whenever the Sumner tunnel tolls exceed the
"operating costs," including sinking fund requirements, the
excess shall be transferred to the general funds of the city
so far as necessary to reimburse it for any amounts raised
by taxation under § 11, and that if such excess occurs after
the city shall have been reimbursed in full for all amounts
so raised by taxation, there shall be established a reduced
schedule of tolls and charges "sufficient, however, to meet
the operating costs."  In § 9 the term "operating costs,"
wherever used in the act, is defined to include interest on all
the tunnel bonds as well as sinking fund requirements, and by
§ 10 so much of the receipts from tolls and charges as are
required to be expended by the provisions of the act for the
payment of the principal and interest of the tunnel bonds
"are hereby pledged to such payment; and said provisions
are hereby declared to constitute contracts between the
city and the holders of said bonds within the meaning of
section ten of Article I of the constitution of the United
States . . . ."  The last paragraph of § 8 provides that
"All tolls . . . shall be used by the treasurer of the city
only to meet the operating costs and, subject to the pro-

visions of section twelve, the excess in any year of such tolls and charges over operating costs shall be paid into . . . [the sinking] fund." The effect of these provisions would seem to be to create a contractual lien upon the tunnel tolls in favor of the holders of tunnel bonds, and this lien appears to be recognized, by the use of the term "operating costs" in § 12, as continuing after the city has been reimbursed for any amounts raised by taxation. See also amendments to the act of 1929 by St. 1932, c. 287, §§ 2, 3, 4, and 5, St. 1935, c. 74, § 2, St. 1935, c. 455, §§ 1, 2, 3, and 4, St. 1937, c. 93, § 2, and St. 1945, c. 361, §§ 4, 5, 6, and 7. We are not informed as to all of the factors that might affect the security of the holders of tunnel bonds. Apparently the provisions of the pending bill in §§ 8 (d), 8 (3), 12 (second sentence), 13, and 14 are intended to provide for payment of the tunnel bonds and interest. Whether these provisions are so "adequate" as to leave no possible question that the holders of tunnel bonds would be as secure under the pending bill as they would be under the statute of 1929 as amended we are unable to judge. If they would be, we answer the question "No." Except for the possible contingency suggested above, we see in the proposed bill no unconstitutional impairment of the provisions of St. 1929, c. 297, § 12.

To question 19 we answer "No." See the answer to questions 2 and 3.

To question 20 we answer "Yes." Since the Authority would be a public corporation, we see no reason why the Commonwealth cannot undertake these payments which would be for a public purpose and would be reimbursed to the Commonwealth. *Horrigan* v. *Mayor of Pittsfield*, 298 Mass. 492, 497–499. See *Opinion of the Justices*, 309 Mass. 571, 592–594; *Opinion of the Justices*, 322 Mass. 745, 749–750; *Opinion of the Justices*, 331 Mass. 771, 777.

Question 21. Since § 1 of the pending bill, to which this question relates, consists entirely of definitions of words and contains no operative provisions, and no question of consti-

tutional law is mentioned, we do not understand what point was intended to be presented, and we respectfully request to be excused from answering this question.

Question 22. Here again the question does not disclose any particular problem that the Senate has in mind. We have already mentioned in our answer to question 18 a situation in which there might conceivably be a violation of art. 1, § 10, of the Constitution of the United States.

To question 23 we answer "a public authority."

To question 24 we answer "No."

To question 25 we answer "No."

To question 26 we answer that the provisions of the pending bill to which reference is made in the question would, in our opinion, be subject to revocation and amendment as explained in, and subject to the limitations mentioned in, our answer to questions 2 and 3.

To question 27, we answer that the provisions of the pending bill to which reference is made in the question would, in our opinion, be subject to revocation and amendment as explained in, and subject to the limitations mentioned in, our answer to questions 2 and 3.

For answer to question 28 we respectfully refer to our answer to questions 2 and 3.

Question 29 is not susceptible of a very satisfactory answer without knowledge of what the "subsequent legislation" might be. In a general way we would answer the question "No." See the discussion in our answer to questions 2 and 3. We are not, however, prepared to say that there could be no subsequent legislation of the types mentioned in the question that would in some manner constitute a violation of § 10 of art. 1 of the Constitution of the United States.

We answer question 30 that there would be a wide field in which it would be constitutionally competent for the General Court to enact legislation of the types mentioned. In a general way our answer is "Yes." See the discussion in our answer to questions 2 and 3. It is impossible to make any more definite answer.

Questions 31 and 32 may be answered together. Both raise the question whether the provisions of the pending bill relative to the proposed trust agreement go too far in leaving the terms of the agreement to be determined by the Authority. We are of opinion that they do not go beyond permissible delegation. We do not agree that the trust agreement "may include any provisions." Section 12 of the bill contains an outline of its nature and some express limitations upon it. In addition it would be implied that the agreement must conform to the general design of the bill and be reasonable and not extravagant in its provisions. We think that these questions find their answer in the well recognized principle that if the General Court indicates in broad outline its purposes and the methods by which they are to be accomplished it can delegate to some other body the working out of all the details. Some recent opinions and decisions are *Opinion of the Justices*, 328 Mass. 674, 676, *McNamara* v. *Director of Civil Service*, 330 Mass. 22, 27–28, *Commonwealth* v. *Sargent*, 330 Mass. 690, *Opinion of the Justices*, 330 Mass. 713, 719, *Russell* v. *Treasurer & Receiver General*, 331 Mass. 501, 507, and (with particular reference to an instance like the present) *State* v. *Florida State Turnpike Authority*, Fla., 80 So. (2d) 337, 345–346.

To question 33 we answer "No" in view of what we have already said as to the power of the General Court to revoke and amend.

To question 34 we answer "No." Article 48 of the Amendments, The Referendum, III, § 2, under the head of "Excluded Matters" provides that no law "the operation of which is restricted to a particular town, city or other political division or to particular districts or localities of the commonwealth . . . shall be the subject of a referendum petition." We think that the pending bill would fall within this provision, and is not taken out of it by the inclusion in § 26 of an appropriation for the expenses of the Authority, for which the Authority is later to reimburse the Commonwealth. *Opinion of the Justices*, 261 Mass. 523, 554. *Christian* v. *Secretary of the Commonwealth*, 283 Mass.

98. *Opinion of the Justices*, 294 Mass. 607. *Opinion of the Justices*, 303 Mass. 615, 626.

STANLEY E. QUA.
JAMES J. RONAN.
RAYMOND S. WILKINS.
JOHN V. SPALDING.
HAROLD P. WILLIAMS.
EDWARD A. COUNIHAN, JR.
ARTHUR E. WHITTEMORE.