## OPINIONS OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

*Massachusetts Port Authority. Constitutional Law*, Obligation of Contracts. *Taxation*, Real estate tax: exemption; Massachusetts Port Authority; Leased property. *Landlord and Tenant*, Taxation.

Proposed legislation providing that real estate owned by the Massachusetts Port Authority and occupied for other than public purposes shall be taxed to the lessees thereof, and repealing the provision of § 17 of the Authority's enabling act, St. 1956, c. 465, that "no property of the Authority shall be taxed to a lessee thereof" under G. L. c. 59, § 3A, on its face imposes no tax burden on the Authority, but could, if lessees, not bound by the lease to pay real estate taxes, shifted the burden thereof to the Authority pursuant to c. 59, § 15, substantially reduce its revenues available to pay the principal of and interest on its outstanding revenue bonds [672-673]; however, such reduction would not constitute an unconstitutional impairment of the bondholders' contract with the Authority, which contains no reference to tax exemptions, since under the enabling act the bondholder's lien attaches only to the Authority's revenues net of "current expenses," which includes taxes on property "under its control," and since § 17 of the enabling act is subject to the Legislature's reserved power to repeal [673-678].

A proposal in a pending legislative bill that real estate owned by the Massachusetts Port Authority and occupied for other than public purposes shall be taxed to the lessees thereof, and repealing the provision of § 17 of the Authority's enabling act, St. 1956, c. 465, that "no property of the Authority shall be taxed to a lessee thereof" under G. L. c. 59, § 3A, would not, as to leases silent on the matter of tax exemptions, constitute an unconstitutional impairment of the lessees' contract with the Authority: the leases were obtained subject to the State's power to tax. [678-679]

BRAUCHER, J., concurring on the understanding that the Justices are not expressing an opinion on the question whether the proposed legislation will result in a taking of the property of the bondholders without compensation or without due process of law. [680]

On June 20, 1974, the Justices submitted the following answers to questions propounded to them by the House of Representatives.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit the following reply to the questions set forth in the order adopted by the House of Representatives on April 18, 1974, and transmitted to the Justices on April 22, 1974, concerning a bill, House No. 5541, entitled, "An Act making holders of certain leasehold interests in proper-- ty owned by the Massachusetts Port Authority liable for local property taxes."

By the express terms of its enabling act, the Massachusetts Port Authority (Authority) is exempted from paying any taxes or assessments upon any project or any property acquired or used by it, "and no property of the Authority shall be taxed to a lessee thereof under section three A of chapter fifty-nine of the General Laws." St. 1956, c. 465, § 17. House No. 5541 would, inter alia, amend the Authority's enabling act by striking from § 17 the quoted language and substituting therefor the following proviso: "provided, however, that property used or occupied for other than public purposes, shall be taxed to the lessee or lessees thereof, or their assigns, or to the occupant or the person in possession thereof, pursuant to section three A of chapter fifty-nine of the General Laws." The bill also provides for appropriate amendment of G. L. c. 59, § 3A, to provide that real estate owned by the Authority and used or occupied for other than public purposes shall be taxed to the lessee or lessees thereof. The provisions of the bill are to apply to real property taxes assessed for the fiscal years commencing on and after July 1, 1975.

The order relates that grave doubt exists as to the constitutionality of House No. 5541 if enacted into law and requests our opinion on eight questions of law, as follows:

"1. Would the enactment of House, No. 5541 unconstitutionally defeat or substantially impair without com-

pensation rights vested under chapter 465 of the acts of 1956?

"2. Would the enactment of said bill result in an unconstitutional impairment of the contractual lien on the revenues of the Massachusetts Port Authority created in favor of the holders of the bonds of said Authority issued and sold under the provisions of chapter 465 of the acts of 1956?

"3. Would the enactment of said bill result in an unconstitutional impairment of the lease agreements between said Authority and lessees of its property entered into in reliance upon the tax exemption contained in section 17 of chapter 465 of the acts of 1956?

"4. Would it constitute a violation of section 10 of Article I of the Constitution of the United States for the General Court to revoke the exemption from taxation granted said Authority by section 17 of chapter 465 of the acts of 1956 or chapter 412 of the acts of 1958 without providing for the payment in full of all outstanding bonds of said Authority?

"5. Would it constitute a violation of section 10 of Article I of the Constitution of the United States for the General Court to revoke the exemption from taxation granted lessees of said Authority by section 17 of chapter 465 of the acts of 1956 without providing for compensation to said lessees for the diminution in value of their leasehold estates?

"6. Would the proposed bill, if enacted, unconstitutionally defeat or substantially impair without compensation rights of purchasers of bonds issued under chapter 465 of the acts of 1956 and pursuant to the trust agreement entered into by and between the Massachu-

setts Port Authority and the New England Merchants National Bank of Boston, as trustee, dated as of July 1, 1964, as amended and supplemented from time to time?

"7. If the answer to question No. 6 is in the affirmative, do the terms of said trust agreement exceed the delegation of authority therefor contained in section 12 of chapter 465 of the acts of 1956 or otherwise constitute a violation of the Constitution of the Commonwealth of Massachusetts?

"8. Would said bill, if enacted, unconstitutionally impair any lease agreements entered into prior to said enactment by and between said Authority and lessees of the Authority's property as to real property taxes assessed for fiscal years commencing on and after July 1, 1975, with respect to any lease agreements which have provisions regarding payment of real property taxes by the lessees?"

Viewed in the abstract, House No. 5541 suffers from no facial constitutional infirmity. As a general rule, there is no question that the Legislature may repeal previously granted tax exemptions. Tax exemptions are a matter of legislative grace. *Assessors of Newton* v. *Pickwick Ltd. Inc.* 351 Mass. 621, 623 (1967). In addition, the Authority's enabling act creates no contract with the State and, as a general rule, is subject to revocation and amendment. *Opinion of the Justices*, 334 Mass. 721, 736 (1956). We are not asked, however, to determine the facial constitutionality of House No. 5541. Rather we are asked to determine whether that bill, if enacted, would operate so as to impair or destroy, in its application, contractual rights created by certain lease and bond agreements to which the Authority is a party. In other words, we must determine whether the proposed amendment of the Authority's enabling act would "defeat or substantially impair without compensation rights vested under the statute" and thus would exceed the Legislature's reserved power of amendment and revocation. *Id.* at 738.

In order to facilitate our understanding of the factual context of the House's questions, we requested briefs from interested parties. Five such briefs were received.[1] In addition, at our request, the Authority submitted for our information certain documents, including copies of eleven lease agreements between the Authority and various of its lessees and a copy of the trust agreement between the Authority and the New England Merchants National Bank. These papers, i.e., the briefs and documents submitted, constitute the only sources from which we have drawn the factual information which is essential to our answers.

At the outset it is necessary to describe in some detail the provisions of the Authority's enabling act (St. 1956, c. 465), the terms of the trust agreement which secures the bonds issued by the Authority, and the terms of the Authority's various leases. We begin with a description of the pertinent provisions of the enabling act.[2]

The Authority was created by the Legislature as "a body politic and corporate" and a "public instrumentality" empowered to perform "an essential governmental function." St. 1956, c. 465, § 2. The Authority owns and operates Logan Airport, the Laurence G. Hanscom Field, the Mystic River bridge and various properties in the port of Boston. §§ 1 (a), 1(g), 1 (i), 5, 6 and 13. The Authority is empowered to lease the projects under its control, § 3 (g), and may fix and revise fees and rentals for the use of its property. §§ 3 (i) and 14. The Authority may issue revenue bonds, payable solely from revenues, to provide funds for various purposes. §§ 3 (h), 8, 9 and 19. Such revenue bonds must be secured by a trust agreement between the Authority and a corporate trustee. § 12. The bonds shall not be

---

[1] Parties submitting briefs were the city of Boston, the State Tax Commission, the Authority, the New England Merchants National Bank, and a group of ten airlines, all corporate lessees from the Authority of real property located at the General Edward Lawrence Logan International Airport (Logan Airport).

[2] A section by section analysis of the entire enabling act as originally enacted may be found in *Opinion of the Justices*, 334 Mass. 721 (1956), and need not be repeated here.

deemed to constitute a debt of the Commonwealth or a pledge of the faith and credit of the Commonwealth. § 11. The only security which the Authority may give for the payment of the principal of and interest on such bonds is a pledge or assignment of the revenues from the Authority's various projects. §§ 12 and 14. The Authority may pledge as security for the bonds all of its revenues in excess of the amounts necessary to pay current expenses and to provide for reserves for current expenses. § 14. Such revenues in excess of current expenses are subject to a lien in favor of the bondholders. § 14. The Authority is required to set tolls, rates, fees, rentals and other charges so that the revenues produced are sufficient to pay current expenses, to pay principal of and interest on the revenue bonds when due and to make certain other specified payments. § 14. The bondholders are granted a judicial remedy to compel the Authority to perform its duties under the enabling act and under the trust agreement. § 16. Finally, as noted at the outset, the Authority and the property it owns are exempted from taxation (with exceptions not here relevant), and it is provided that lessees of the Authority's real property shall not be taxed under G. L. c. 59, § 3A. § 17.

Pursuant to the enabling act (§ 12), the Authority has issued revenue bonds which are secured by a trust agreement between the Authority and the New England Merchants National Bank as trustee. (We are informed that there is approximately $317,000,000 principal amount of such revenue bonds now outstanding.) The trust agreement contains detailed provisions for the allocation and distribution of the Authority's revenues. In summary, it provides that the Authority deposit daily with the trustee all its revenues, and that such revenues are subject to a lien in favor of the trustee and the bondholders. At the beginning of each month the trustee is required to distribute the revenues received during the preceding month among various funds according to certain stated priorities. For present purposes it is sufficient to note that the revenues are first allocated to the payment of current expenses and the remaining revenues are next allocated to the payment

of the interest on and principal of the outstanding revenue bonds. The trust agreement closely tracks the enabling act in providing that the Authority shall set tolls, rates, fees, rentals and other charges so as to produce sufficient revenues to meet the required payments on the bonds, and the bondholders are provided a judicial remedy to enforce a revision of such charges when revenues are inadequate to meet the bond obligations. The Authority covenants with the bondholders that it will use its revenues only for the purposes specified in the trust agreement and that it will not create or suffer to be created any lien or charge upon any of its projects except as provided in the trust agreement. It is stated in the trust agreement that the Authority was created by St. 1956, c. 465, but there is no mention of or reference to the tax exemption of the Authority, its property and lessees of its property which is contained in § 17 of the enabling act.

Also pursuant to its enabling act ( § 3 [g]), the Authority as lessor has entered into numerous lease agreements which permit the operation of private businesses on the Authority's property. We are informed that the Authority has executed in excess of 500 leases since 1967. The Authority, at our request, has submitted to us copies of most, if not all, of its leases which contain provisions regarding the payment of real estate taxes by the lessees. Since only eleven such leases were submitted, it is apparent that the great majority of the Authority's leases contain no such real estate tax provision. Each of the leases which is before us contains an express provision that the lessee shall pay any real estate taxes which may be assessed against the leased property. None of those leases contains any mention of or reference to the exempting provision ( § 17) of the Authority's enabling act.

We turn now to a consideration of the questions propounded by the House of Representatives.

The first question asks whether House No. 5541 would "unconstitutionally" defeat or impair "rights vested" under the Authority's enabling act. In the absence of any specification of whose rights or what specific constitutional

provision or provisions the House is concerned with, we are unable to answer this question.

Questions 2, 4, and 6 all concern the constitutionality of House No. 5541 vis-à-vis the holders of the Authority's revenue bonds. Although each of those questions is phrased somewhat differently, they all raise the same basic issue: would House No. 5541, if enacted, by reducing the revenues available for the payment of the principal of and interest on the Authority's outstanding bonds, operate to impair the obligations of those bonds, in violation of art. 1, § 10, of the United States Constitution?[3] In other words, is the property tax exemption of the Authority's lessees which is contained in § 17 of the enabling act an implied term of the contract between the Authority and the bondholders which cannot be repealed without unconstitutionally impairing the obligation of those bonds?

An initial problem is to determine in what respect, if any, House No. 5541 might operate to "impair" the revenues of the Authority which are pledged to payment of the bonds. The bill would repeal only that property tax exemption which is currently enjoyed by certain lessees of the Authority. Thus, the effect of House No. 5541 would be to impose a tax which would be payable by the Authority's lessees, and not by the Authority itself. If the Authority bears none of the tax burden which would result from House No. 5541, then it would appear that its revenues will not be affected, and there can be no impairment of the value of or security for the Authority's bonds.

There is, however, a substantial possibility that those lessees whose leases contain no property tax provision would be able to shift the burden of their property tax liability onto the Authority under our cases interpreting G. L. c. 59, § 15.[4] See *Gloucester Ice & Cold Storage Co.* v. *Assessors of Gloucester*, 337 Mass. 23 (1958); *Atlantic Ref.*

---

[3] Article 1, § 10, the "contracts clause," provides: "No state shall . . . pass any . . . law impairing the obligation of contracts."

[4] General Laws c. 59, § 15, reads as follows: "If a tenant paying rent for real estate is taxed therefor, he may retain out of his rent the taxes paid by him, or may

*Co.* v. *Commonwealth,* 339 Mass. 12 (1959); *Gloucester Community Pier Assn. Inc.* v. *Dehydrating Process Co. of Gloucester, Inc.* 339 Mass. 14 (1959). In addition, because at least some of the leases are of shorter term than the outstanding bonds, there is the possibility that the Authority's revenues available for payment of those bonds will be adversely affected when the rentals charged by the Authority are renegotiated in light of the newly imposed property tax liability of the lessees. For present purposes, therefore, we shall assume that House No. 5541, which on its face does not impose any tax burden on the Authority, might in fact have a substantial impact on the Authority's revenues.[5] Assuming such a "substantial impact," then, would House No. 5541 operate to impair the obligation of the bondholders' contract with the Authority?

The essential obligations of the bondholders' contract, i.e., that the Authority make timely payment of the interest on and principal of the bonds, would be unaffected by House No. 5541. Nor would House No. 5541 affect the requirement that the Authority maintain its various charges at levels which produce revenues sufficient to meet its bond obligations. The bondholders would still have a judicial remedy to enforce that requirement. It is argued, however, that the bill would operate to impair the bondholders' contract by reducing the revenues subject to the bondholders' lien, thus reducing the value of and the security for the bonds. To the extent such reduction of revenues would occur, we do not believe it would constitute an impairment of the Authority's contractual obligations.

In the first place, by the terms of the enabling act, the bondholders' lien attaches only to the Authority's revenues net of "current expenses." St. 1956, c. 465, § 14. "Current

---

recover the same in an action against his landlord, unless there is a different agreement between them."

[5] We are told that within the city of Boston alone the property of the Authority which might be subject to tax because of House No. 5541 has an assessed valuation of approximately $60,000,000. Of course, we have no way of knowing what the total tax bill on such property might be, nor do we know what share of that tax bill might ultimately be paid from the Authority's revenues.

expenses," as mentioned earlier, are defined to include "any taxes which may be lawfully imposed on the Authority or . . . the property under its control." § 1 (e). Thus, as a technical matter, any tax payments made by the Authority would come out of its revenues prior to the attachment of the bondholders' lien. There would be no depletion of the revenues to which the lien has attached.

The practical effect of such tax payments, however, would quite clearly be to reduce to some extent the revenues which are available for bond payments. Nevertheless, such a reduction would not constitute a substantial impairment of the bondholders' contract. In *Massachusetts Port Authy.* v. *Treasurer & Recr. Gen.* 352 Mass. 755 (1967), we held that an amendment of the enabling act which expanded the Authority's liability for employee pension payments did not effect any unconstitutional impairment of the security behind the Authority's revenue bonds, even though the effect of the amendment was to increase the Authority's operating expenses (thus decreasing the amount of revenues subject to the bondholders' lien). *Id.* at 762. Contra, *First Natl. Bank* v. *Maine Turnpike Authy.* 153 Maine 131 (1957). Such amendment was within the scope of the Legislature's reserved police powers. *Massachusetts Port Authy.* v. *Treasurer & Recr. Gen.* 352 Mass. at 762 (1967). Similarly, as to the issue now before us, it is within the Legislature's reserved taxing power to amend § 17 of the enabling act unless it can be shown that the Authority has been empowered to enter contracts which bar the Legislature from exercising that power.

In two of the amicus briefs it is vigorously argued that purchasers of the Authority's bonds have relied heavily on the provisions of the enabling act in analyzing the potential investment risk of those bonds. Reliance on the tax exemption provisions was especially important because the property tax exemption of the Authority's lessees would mean that the Authority could charge those lessees higher rentals, thus increasing the Authority's revenues and increasing the security for the bonds. Thus, we are told, the

entire enabling act, and the property tax exemption provision in particular, must be considered as terms of the Authority's contract with its bondholders. The thrust of this argument is that bond purchasers relied not only on the existence of the lessees' property tax exemption at the time they purchased their bonds, but also on the continued existence of that exemption during the terms of their bonds. In other words, we are asked not only to read § 17 of the enabling act into the trust agreement, but also to construe § 17 as authorizing the Authority to enter contracts which would effectively abrogate the Legislature's reserved taxing power as to the Authority and the properties it owns. We do not believe § 17 bears such a construction, nor do we believe that purchasers of the Authority's bonds could justifiably have relied on the continuation in perpetuity of the tax exemptions provided in the enabling act.

It is true that "the sovereign power . . . may in certain conditions for the public welfare" enter into, or authorize a political subdivision to enter into, a binding contract of tax exemption which would be protected from repeal by the contracts clause. *Opinion of the Justices*, 261 Mass. 523, 553 (1927). *Opinion of the Justices*, 341 Mass. 760 (1960). *New Jersey* v. *Wilson*, 7 Cranch 164 (1812). Nichols, Taxation in Massachusetts (3d ed.) 30-31 (1938). It is also true, however, that the intent to contract away the taxing power must expressly appear. "Before a statute — particularly one relating to taxation — should be held to be irrepealable, or not subject to amendment, an intent not to repeal or amend must be so directly and unmistakably expressed as to leave no room for doubt; otherwise, the intent is not plainly expressed. It is not so expressed when the existence of the intent arises only from inference or conjecture." *Covington* v. *Kentucky*, 173 U. S. 231, 239 (1899). See *Opinion of the Justices*, 261 Mass. 523 (1927); *Opinion of the Justices*, 341 Mass. 760 (1960); *Tacoma* v. *State Tax Commn.* 177 Wash. 604 (1934). There is no such expression of intent in § 17 or elsewhere in the Authority's enabling act.

In addition, such binding contracts of tax exemptions are valid only if limited to a "reasonable" period of time. *Opinion of the Justices*, 341 Mass. at 786 (1960). Section 17 of the enabling act contains no time limitation whatsoever. Compare with § 17 the provision of § 20 of the enabling act that purports to exempt the Authority from certain forms of competition for "so long as any bonds issued under the provisions of this act shall be outstanding." Since there is no such language in § 17, and since the Legislature could not have intended a perpetual guaranty of tax exemption, see 341 Mass. at 786; cf. *Opinion of the Justices*, 293 Mass. 589 (1935), it is clear that in enacting § 17 the Legislature did not intend to surrender its reserved power to amend or repeal the tax exemption provisions. Accord, *Tacoma* v. *State Tax Commn.* 177 Wash. 604 (1934). Cf. *People of New York on the Relation of Troy Union R.R.* v. *Mealy*, 254 U. S. 47 (1920).

As the foregoing discussion demonstrates, the enabling act does not empower the Authority to enter contracts guaranteeing the continuation for any length of time of the property tax exemption of the Authority's lessees. The trust agreement purports to make no such guaranty. To the argument that the bondholders relied on the irrevocability of the property tax exemption we need only answer that, to the extent there was such reliance, it was unjustified. In this regard we note that the *Opinion of the Justices* in which we reviewed the constitutionality of the enabling act prior to its enactment contains repeated assertions that the enabling act and each of its provisions are subject to revocation and amendment. 334 Mass. 721, 736-737, 738, 742 (1956). Particularly pertinent is our determination that § 20, which guarantees the Authority's freedom from competition for as long as it has bonds outstanding, is nevertheless subject to revocation or amendment. *Id.* at 736-737. Any such alteration of the Authority's no-competition guaranties would affect its revenues just as surely as a change in its tax-exempt status. We noted, of course, that the Legislature's reserved power to revoke or amend is subject to certain constitutional limitations which, al-

though "real," are "not exactly defined." *Id.* at 737. In light of the repeated emphasis throughout that opinion on the general rule of revocability, however, it is unlikely that a prudent investor, in purchasing the Authority's bonds, would have relied on § 17 of the enabling act being protected from amendment or repeal by one of those undefined limitations.

Since there is not, and cannot be under the enabling act, any binding contract of tax exemption, the issues now before us are governed by the case of *Massachusetts Port Authy.* v. *Treasurer & Recr. Gen.* 352 Mass. 755 (1967), discussed above. To be distinguished is the *Opinions of the Justices*, 356 Mass. 775 (1969), in which we declared unconstitutional on contracts clause grounds a bill which would have barred the Massachusetts Turnpike Authority (Turnpike Authority) for a specified period of years from increasing the tolls charged for use of the Sumner and Callahan tunnels. See also *Opinion of the Justices*, 190 Mass. 605 (1906). The Turnpike Authority had issued bonds which were secured by the revenues received from the tunnels. The trust agreement securing the bonds expressly incorporated the provision of the Turnpike Authority's enabling act that required tunnel tolls to be adjusted to ensure revenues sufficient to meet the bond obligations. 356 Mass. at 793 (1969). By the enabling act the bondholders were given a judicial remedy to compel the Turnpike Authority to perform its duties, "including the fixing, charging and collecting of tolls." St. 1958, c. 598, § 13. Thus, to permit the Legislature subsequently to forbid the adjustment of tunnel tolls "would be a direct legislative repudiation of an arrangement which the 1958 statute empowered the Authority to make, going to the essence of the bond contract and materially reducing the attractiveness of the revenue security." 356 Mass. at 794 (1969).

As to the questions now before us, no express provision of the bondholders' contract would be affected by House No. 5541, nor is there any legislatively authorized "arrangement" of permanent tax exemption which would be repu-

diated by that bill. Most importantly, House No. 5541 would impose no legal restriction on the Authority's ability to pay its bond obligations, see *Opinion of the Justices*, 297 Mass. 582 (1937); *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 336 Mass. 651 (1958), nor would it defeat the bondholders' judicial remedies against the authority. Compare *Home Bldg. & Loan Assn.* v. *Blaisdell*, 290 U. S. 398 (1934), with *W. B. Worthen Co.* v. *Kavanaugh*, 295 U. S. 56 (1935).

In light of the foregoing discussion, we answer "No" to each of questions 2, 4 and 6.

Questions 3, 5 and 8, each of which concerns the constitutionality of House No. 5541 vis-à-vis the lessees from the Authority who would become liable for the payment of real property taxes, raise issues which are essentially identical to those already discussed in answering questions 2, 4 and 6. None of the leases which have been submitted to us contains any express reference to § 17 of the Authority's enabling act, nor does any purport to assure the lessee of the continuance of the property tax exemption. (In fact, each such lease contains express provision for the possibility that property taxes might subsequently be imposed.) Since we are not informed otherwise, we assume that the great majority of the leases which the Authority has executed as lessor are entirely silent on the matter of tax exemptions. Thus, it cannot be said that the repeal of the lessees' property tax exemption by House No. 5541 would abrogate any express term of their leases. And what we have said with regard to the bondholders disposes of any argument that a guaranty of tax exemption arises by implication because of the lessees' reliance on such exemption. As was said by the United States Supreme Court in a similar context, the "leases were obtained subject to the State's power to tax. If the statute now in controversy is within that power, it cannot impair the obligation of appellants' contracts." *Lake Superior Consol. Iron Mines* v. *Lord*, 271 U. S. 577, 581 (1926). Accord, *Barwise* v. *Sheppard*, 299 U. S. 33 (1936).

We answer "No" to questions 3, 5 and 8.

Because we answered "No" to question 6, question 7 by its own terms requires no answer.

In conclusion, a brief caveat is in order. To answer adequately the questions addressed to us we have been required to construe existing contracts which control the legal relationships between the Authority and its bondholders and between the Authority and certain of its lessees. Our answers are based on the information and documents which have been submitted by the various amici curiae. None of the bondholders, and only a few of the lessees, have submitted briefs. While we believe that the information available to us provides an adequate basis for the opinions we have expressed, we recognize that an actual lawsuit challenging the application to a particular litigant of House No. 5541, if enacted, might produce a factual record which would cast the issues we have dealt with in a different light. In this context, then, it is well to repeat that Opinions of the Justices " 'are advisory in nature, given by the justices as individuals in their capacity as constitutional advisors of the other departments of government and without the aid of arguments, are not adjudications by the court, and do not fall within the doctrine of stare decisis.' If the same question arises later in the course of litigation, it is the duty of the court to consider it anew, unaffected by the advisory opinion." *Opinion of the Justices*, 341 Mass. 738, 748 (1960), quoting from *Commonwealth* v. *Welosky*, 276 Mass. 398, 400 (1931).

G. JOSEPH TAURO
PAUL C. REARDON
FRANCIS J. QUIRICO
EDWARD F. HENNESSEY
BENJAMIN KAPLAN
HERBERT P. WILKINS

I agree with the answers given by the Justices, but only on the understanding that, on the premises submitted to

us, we are not expressing an opinion on the question whether the statute will result in a taking of the property of the bondholders without compensation or without due process of law. See *Opinion of the Justices*, 334 Mass. 721, 737 (1956).

ROBERT BRAUCHER