OPINION OF THE JUSTICES TO THE SENATE.

*Constitutional Law*, Taxation, Equal protection of laws, Necessity, Corporate charter, Public purpose, Redevelopment of land. *Taxation*, Real estate tax: proportionality. *Corporation*, Charter. *Redevelopment of Land*.

Proposed legislation giving to a corporation to be formed to develop a large tract of land in Boston special tax advantages over other taxpayers in that for several years the assessable valuation of its real estate would remain the same regardless of value in fact added thereto, in that thereafter the taxes payable by it would be partially dependent on its profits and payment thereof might be deferred for a long period or even never be made in full in some circumstances, in that it might seek tax abatements without first paying any part of the taxes, and in that it would be relieved of paying interest on taxes to a certain extent, would be unconstitutional as not imposing on the corporation its "share" of tax burdens as required by art. 10 of the Declaration of Rights of the Massachusetts Constitution nor providing for "proportional and reasonable" taxes as required by Part II, c. 1, § 1, art. 4, and as denying equal protection of the laws in violation of the Fourteenth Amendment to the Federal Constitution. [779–780]

A statute unconstitutional in its substance does not acquire "constitutional sanction" by legislative declarations of necessity for its enactment. [780]

Proposed legislation providing that, so long as borrowings by a corporation should remain outstanding, its powers, duties or existence should not be diminished or impaired in any way affecting adversely the interests and rights of the lenders would be unconstitutional as in conflict with art. 59 of the Amendments to the Massachusetts Constitution. [781]

A project respecting a large tract of land in Boston, the primary design of which was not slum clearance but the acquisition by the city of purchase options on lands in the tract and the sale by the city of the options for transfer to and exercise by a corporation to be organized with a view to formulating and carrying out, subject to control by a city board, a plan for development of the tract contemplating devotion of some parts of it to truly public uses and the rest of it to private use for private profit, was not for a public purpose justifying expenditure of public money of the city in its accomplishment, even if the tract was "an area of economic blight" whose development as proposed was "necessary· to support the economic well-being" of the city and would benefit the areas adjacent to the tract and the city as a whole. [781–784]

On May 13, 1955, the Justices submitted the following answers to questions propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit these answers to questions set forth in an order of the Senate dated April 14, 1955, and transmitted to us on April 20.

The questions relate to the constitutionality of a proposed act for the development of an area of about twenty-eight acres of land in the Back Bay section of the city of Boston hitherto principally used as a railroad yard by the Boston and Albany Railroad, but the use of which for that purpose apparently either has been abandoned or is about to be abandoned. The proposed act was submitted as "Appendix A" to the report of the special commission created to investigate the subject by c. 98 of the Resolves of 1954. A copy of the report is annexed to the order transmitted to us.

The proposed act is somewhat complicated. We shall not attempt to state its provisions in any greater detail than seems necessary to an understanding of the questions and answers. After preliminary definition of words and expressions used in the act (§ 1), there are legislative declarations in substance that the tax structure of the city is threatened by the fact that the yard will not be usefully employed and will be "an area of economic blight and a potential breeding place for crime and juvenile delinquency and will therefore adversely affect the value of adjacent properties"; that the development of the yard in the manner set forth in the act is necessary to support the economic well-being of the city and the Commonwealth; that private enterprise without the aids provided in the act will not undertake orderly and integrated development; that the public interest requires development in accordance with a broad plan, including transportation connections, a street system, parks, parking facilities, and a convention hall or civic auditorium, all subject to the special controls set forth in the act; that without

the special provisions of the act no such plan will be formulated; and that to accomplish these "public purposes" the special treatment with respect to taxation contained in the act is desirable and necessary. § 2.

The act then provides for the creation in a department of the city of a board of three commissioners to be known as the Back Bay Development Commission. § 3. This commission in the name and behalf of the city is to acquire by eminent domain or otherwise and to sell options to purchase lands within the area. Such options are to be sold only as a unit and only to the highest responsible bidder after certain prescribed advertising, each bid to be accompanied by a certified check on, or a treasurer's or cashier's check issued by, a responsible bank for $300,000 to be retained by the city as liquidated damages if the bid is accepted and the bidder fails to carry out his part as provided in the act. § 4.

The successful bidder who acquires the options is to cause a corporation to be formed under c. 156 of the General Laws, to which all of the options are to be conveyed. The corporation shall then exercise the options and shall submit to the commission a plan showing the lands acquired and to be acquired, the portions to be devoted to public ways, public parks, public buildings, or other public uses, and the proposed subdivision of the remainder into lots or sites for private uses, with the nature of such uses and the location and description of public utilities and such other data as the commission may require. If, after reference to the planning board and to certain other boards of the city, the commission finds that development in accordance with the plan will not be detrimental to the amenities, health, safety, convenience, morals, or welfare of the city or of the community in which the area is situated; that the development will increase the assessable value of said lands not less than ten times that of January 1, 1954; and that the development will include an auditorium and exhibition hall suitable for exhibitions, conventions, and other shows and gatherings, the commission shall approve the plan, requiring, however,

as a condition precedent to such approval a covenant of the corporation with the city that the corporation will develop the lands in conformity with the plan and will grant to the city for one dollar all lands to be devoted to public uses and all sewer and water systems within public places, and will in general construct the public ways, parks, and public places and sewer and water systems shown on the plan. §§ 5, 6. There are provisions under which the city may purchase the convention hall or civic auditorium by paying the construction cost without including the value or cost of the land. § 7.

The corporation may borrow on mortgage from time to time such sums as it may determine, and the commission shall approve the amount of borrowings and the interest rate and repayment schedule, if in its opinion the aggregate of borrowings will not exceed the aggregate construction costs and the interest rate and repayment schedule are reasonable. While any such borrowings remain outstanding "the powers, duties or existence of the corporation shall not be diminished or impaired in any way that will affect adversely the interests and rights of the lenders." § 8.

Special and unusual provisions relative to taxation of the real estate of the corporation are contained in § 9 when read in connection with the definition of "operating receipts" in § 1. Section 9, clause A, provides that for each of the first five calendar years next following the year in which the act becomes effective the taxes "shall be a sum equal to the product obtained by multiplying $5,670,000 by the tax rate applicable for each such year." That is to say, no matter how much value shall have been added to the land by new construction, and although the development plan is supposed to increase the assessable value of the land not less than ten times that of January 1, 1954, the valuation for tax purposes for five years is fixed by the statute and must never exceed $5,670,000. It is stated in the order of the Senate that the assessed value for 1954 was $4,550,000. Section 9, clause A, therefore means that no matter how much building should be done in the first five years the assessed value of the

properties could not be increased over that in 1954 by more than $1,120,000.

After the first five years a new method of taxation is provided under the act (§ 9, clauses D and E). Until the corporation has paid all of its approved borrowings no decree shall be entered foreclosing the right to redeem any parcel from a tax title, nor shall other methods of collecting the tax be employed, if so much of the tax has been paid as would have been assessable upon a valuation of three times the value of the parcel on January 1, 1954, with interest at four per cent from October 1 of the year of assessment, and if in addition thereto has been paid "so much of the balance of the tax as is covered by the operating receipts of the corporation in the year of assessment" with interest at four per cent from the last day of January of the year following the year of assessment, and if in any year in which the "operating receipts" exceed the real estate tax obligations of the corporation such excess has been paid on account of the unpaid balance of real estate taxes assessed in prior years. Section 1 contains an elaborate definition of "operating receipts" which it is not necessary to repeat here in detail. In general "operating receipts" are gross receipts after deducting expenses, including interest and payments on borrowings, reserves in accordance with usual accounting practices, the tax assessable on three times the value of the corporation's real estate valued as of January 1, 1954, and certain other taxes. There is also the peculiar provision that in any year in which the "operating receipts" would exceed the amount by which one half of the taxes assessed on real estate to the corporation for that year is greater than the sum which would be assessable on three times the value of that real estate on January 1, 1954, one third of the excess is to be *excluded from the gross receipts*. All this appears to mean that in any given year, no matter how much value has been added by buildings on the land, the corporation cannot be compelled to pay more than a tax on three times the value as of 1954 unless there are "operating receipts," and even if there are, such receipts are fully applicable to the taxes

only up to half the taxes assessed, and if the sum which for present purposes may with sufficient accuracy be termed profits amounts to more than that half, the corporation may keep one third of the excess and apply only two thirds toward taxes.

Although collection of the taxes is deferred in the circumstances hereinbefore stated, it is provided that the tax lien shall continue until the tax has been paid or abated. § 9, clause D. It is further provided in § 10 that (a) upon the expiration of forty-five years after the year in which the act becomes effective, or (b) when the corporation has paid the aggregate of its approved borrowings, or (c) when it shall have performed all its obligations to the city and shall have notified the commission of its election to be free from the provisions of the act, whichever shall first occur, the corporation shall have all the rights and be subject to all the duties of a corporation organized under c. 156 of the General Laws, but shall not be released from its obligation to pay any unpaid taxes, nor shall the lien therefor be released.

Not only is it possible that the actual collection of taxes may be delayed for as long as forty-five years after the act becomes effective, as hereinbefore appears, but there are provisions in §§ 11 and 12, which might, as far as we can see, result, in some circumstances, in the taxes never being fully paid. Thus in § 11 it is provided that if a mortgage given by the corporation to secure an approved borrowing is foreclosed, or if the corporation makes a conveyance or release to avert such foreclosure, the successor in interest may elect to hold the property free from the act and free from the lien for any real estate taxes as to which a decree of foreclosure could not then be entered, or to convey to a purchaser to be so held. And under § 12, if real estate is sold by the corporation, the proceeds are to be applied to release the land from any mortgage securing approved borrowings before such proceeds become applicable to taxes for which the lien could not then be foreclosed, and if the commission shall approve a sale for a consideration

insufficient to pay taxes applicable to the real estate to be sold, the lien shall be discharged upon payment of the consideration to the collector-treasurer of the city.

The corporation would enjoy other special tax advantages under the statute. The corporation itself or any person claiming by, through, or under it, if aggrieved by a real estate tax assessed upon the corporation, may apply for an abatement or appeal from a refusal of an abatement without first paying any part of the tax. § 9, clause B. Other real estate taxpayers would be required to pay either the whole or a portion of any tax of more than $1,000 as provided in G. L. (Ter. Ed.) c. 59, § 64, as appearing in St. 1945, c. 621, § 5, and G. L. (Ter. Ed.) c. 59, § 65, as appearing in St. 1945, c. 621, § 6. See also § 65B, as appearing in St. 1945, c. 621, § 7. And it is provided in § 9, clause C, that interest shall not be payable with respect to any real estate tax assessed to the corporation, except as expressly provided in clauses D and E of that section. Other real estate taxpayers must pay interest on the entire amount of taxes unpaid on November 1 of each year, computed from October 1. G. L. (Ter. Ed.) c. 59, § 57, as amended by St. 1947, c. 522, § 1.[1]

The questions are these:

"1. Is it within the competency of the general court under Article IV of section one of chapter one of the constitution of Massachusetts, or under Article X of the Declaration of Rights, to enact a law providing for the taxation, concessions and exemptions therefrom of the real estate of the area as set forth in said proposed bill?

"2. Would the tax concessions, and deferments provided in said proposed bill result in the disproportionate taxation of other property in the city of Boston and thus be violative of any provision of the constitution relating to taxation of real estate and the exemption therefrom?

"3. Would the enactment into law of said proposed bill

---

[1] Later amendments are not here material.

violate the constitutional mandate that, in order to be proportional the amount to be raised by taxation shall be shared by the taxpayers according to the taxable real and personal estate of each?

"4. Would the enactment into law of said bill violate the due process clause in the equal protection of the laws clause of the fourteenth amendment to the constitution of the United States?

"5. Does the statement of the necessity of the enactment into law of said bill as contained in said bill add any constitutional sanction to the tax concessions therein proposed?

"6. May the general court enact legislation that the real estate of said area shall be taxed at a stated amount as provided in said proposed bill?

"7. May the general court enact legislation that the real estate of said area shall be taxed at a certain amount without regard to its fair cash value on the assessment date as provided in said proposed bill?

"8. May the general court enact legislation providing for the deferment of collection of taxes on the real estate in said area as provided in said bill?

"9. May the general court enact legislation providing for deferments of the collection of taxes as provided in said proposed bill?

"10. May the general court enact legislation providing that the right of appeal shall be permitted without payment of all taxes?

"11. May the general court enact legislation providing tax concessions (1) because of the size of the payment, (2) To encourage investors to loan large sums on first mortgage bonds with reasonable assurance that their loans would be serviced and amortized according to schedule?

"12. May the general court enact into law a bill containing the principal tax concessions as contained in VIII — The present proposal, appearing in pages 10 and 11 of the report?

"13. May the general court enact legislation providing that —

"A. The charter of the proposed corporation shall be subject to amendment except as to its tax provisions; and

"B. That while any borrowings by the corporation remain outstanding, the powers, duties or existence of the corporation shall not be diminished or impaired in any way that will affect adversely the interests and rights of the lenders?

"14. May the city of Boston spend public money to acquire such options as the commission shall deem necessary to achieve the objectives of the proposed bill, to approve the borrowing of money by the proposed corporation and the interest rate thereon, to see that the interest rate and repayment schedules are reasonable, to see that the plans must increase the assessable value not less than ten times the value of the 1953 assessment, and to audit the books of the proposed privately owned corporation with the powers and duties as set forth, as provided in said proposed bill?"

We begin our discussion with the provisions of the proposed act relative to taxation. Two provisions of the Constitution are here relevant and controlling. The first is contained in art. 10 of the Declaration of Rights, the first portion of which reads: "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws. He is obliged, consequently, to contribute his share to the expense of this protection . . . ." In the present connection the emphasis is upon the words "his share." These words forbid the imposition upon one taxpayer of a burden relatively greater or relatively less than that imposed upon other taxpayers. If this is not the meaning of these words they mean nothing at all. Words of the Constitution cannot be ignored as meaningless. In *Opinion of the Justices*, 270 Mass. 593, at page 599, it is said that this provision of the Declaration of Rights "is the statement of a general prin-

ciple. It is controlling of all constitutional provisions touching taxation." See *Opinion of the Justices*, 324 Mass. 724, 727.

The second provision of the Constitution to which we have referred above is found in Part II, c. 1, § 1, art. 4, and is more precise in its terms. The General Court is there given power, among other things, "to impose and levy proportional and reasonable assessments, rates, and taxes, upon all the inhabitants of, and persons resident, and estates lying, within the said commonwealth . . . ." This provision applies to property taxes rather than to excises, and is accompanied by a further requirement contained in the same article that there shall be a valuation of estates anew at least once in ten years. For present purposes the emphasis in this article is upon the words "proportional and reasonable." Of this expression this court said in *Cheshire* v. *County Commissioners of Berkshire*, 118 Mass. 386, at page 389, "That provision requires that all taxes levied under its authority be 'proportional and reasonable,' and forbids their imposition upon one class of persons or property at a different rate from that which is applied to other classes, whether that discrimination is effected directly in the assessment or indirectly through arbitrary and unequal methods of valuation. . . . The test, in all legislative enactments affecting taxation, is that their aim be towards that result [proportional and reasonable taxation], by approximation at least. No enactment respecting taxation under this clause conforms to its provisions if it directly and necessarily tends to disproportion in the assessment." These provisions of the Constitution were fully considered in the recent *Opinion of the Justices* in 324 Mass. 724, at pages 727–729, where the Justices gave their opinion that a proposed exemption from taxation of new residential buildings for a period of five years after construction would be in violation of the Constitution. Many authorities are there cited from the early days of the Commonwealth to the present time, among the principal of which it may be well again to refer to *Portland Bank* v. *Apthorp*, 12 Mass. 252, 255–256, *Oliver* v. *Wash-*

*ington Mills*, 11 Allen, 268, 275–279, *Dorgan* v. *Boston*, 12
Allen, 223, 234–238, 240–241, *Connecticut Mutual Life Ins.
Co.* v. *Commonwealth*, 133 Mass. 161, *Opinion of the Justices*,
195 Mass. 607, 611–614, *Opinion of the Justices*, 208 Mass.
616, *S. S. White Dental Manuf. Co.* v. *Commonwealth*, 212
Mass. 35, 38–39, *Opinion of the Justices*, 220 Mass. 613,
and *Perkins* v. *Westwood*, 226 Mass. 268.

It follows in our opinion that the provisions of the pro-
posed act by which valuations for the purposes of assessment
are to remain the same for five years, regardless of the values
added by buildings, while taxpayers in general are required
to pay annually upon total value, charge the corporation
with less than its share of the public expense, necessarily
produce disproportion, are unreasonable in the constitu-
tional sense, and are unconstitutional. We are further of
opinion that the other provisions by which the taxes pay-
able by the corporation in any year are in part dependent
upon profits and by which payment may be deferred as
long as forty-five years and in certain contingencies may
even never be made and the special provisions as to interest
and as to application for abatement without paying any
part of the tax, while other taxpayers must pay annually on
full value without regard to profit and without special ad-
vantages as to interest and abatements, result in charging
the corporation with less than its share of the public expense,
produce disproportion, and are unreasonable and uncon-
stitutional.

It follows from what has been said that questions 1, 6, 7,
8, 9, 11, and 12 must be answered in the negative and ques-
tions 2 and 3 in the affirmative. The answer to question
10 is that the General Court may not grant to a single tax-
payer special and peculiar privileges with reference to ap-
peal.

Question 4 inquires whether the proposed act would vio-
late the Fourteenth Amendment to the Constitution of the
United States. That amendment provides in part that no
State shall "deny to any person within its jurisdiction the
equal protection of the laws." Equal protection of the laws

requires of course that all persons in the same category and in the same circumstances be treated alike. In *Cumberland Coal Co.* v. *Board of Revision of Tax Assessments*, 284 U. S. 23, at page 28, the court says, "It is established that the intentional, systematic undervaluation by state officials of taxable property of the same class belonging to other owners contravenes the constitutional right of one taxed upon the full value of his property." See *Nashville, Chattanooga & St. Louis Railway* v. *Browning*, 310 U. S. 362; *Charleston Federal Savings & Loan Association* v. *Alderson*, 324 U. S. 182, 190–191; *Hillsborough* v. *Cromwell*, 326 U. S. 620, 623; *Wheeling Steel Corp.* v. *Glander*, 337 U. S. 562, 571–572; *Old Colony Railroad* v. *Assessors of Boston*, 309 Mass. 439, 440–441; *Eyers Woolen Co.* v. *Gilsum*, 84 N. H. 1, 27–29. Compare *Assessors of Haverhill* v. *New England Telephone & Telegraph Co.*, ante, 357. The proposed act would tax the property of the corporation upon a different and more favorable basis than that upon which similar property of other owners would be taxed and would thus violate the equal protection clause of the Fourteenth Amendment. Whether it would also violate the due process clause does not seem to require separate consideration. We answer question 4 in the affirmative.

In reference to question 5 we would say that the court will carefully consider all legislative recitals and will give respectful weight to them, but the court as well as the Legislature is bound by the Constitution. If, therefore, after careful examination, an enactment is seen to be unconstitutional in its substance, it cannot be saved merely by legislative declarations, and it will be the duty of the court to follow the Constitution until the people see fit to amend it. *Opinion of the Justices*, 220 Mass. 613, 620. And it may be added that in general "necessity" must give way to the Constitution and not the Constitution to "necessity." We answer question 5 in the negative.

By question 13 A inquiry is made whether the General Court may provide that the charter of the proposed corporation "shall be subject to amendment except as to its

tax provisions." Inasmuch as we regard the tax provisions as invalid for reasons already fully stated, it does not seem necessary to answer whether, if they were valid, they could be preserved from amendment. See also the answer to question 13 B below.

Question 13 B relates to the validity of the provision of the proposed § 8 that while any borrowings remain outstanding, the powers, duties or existence of the corporation shall not be diminished or impaired in any way that will affect adversely the interests and rights of the lenders. The pertinent portion of the Constitution is art. 59 of the Amendments, which reads, "Every charter, franchise or act of incorporation shall forever remain subject to revocation and amendment." It seems to us that the proposed provision in § 8 is in direct conflict with art. 59 and is unconstitutional. Section 8 does not in our opinion speak the language of contract between the Commonwealth and the corporation. The contracts are between the corporation and the lenders. What was said in *Opinion of the Justices*, 261 Mass. 523, at pages 552–553, as to the power of the Commonwealth to enter into binding contracts notwithstanding art. 59 has no application here. We answer question 13 B in the negative.

Question 14 raises an entirely different point — whether the plan as a whole is for a public purpose. This becomes important because the proposed act contemplates that the development commission shall expend public money of the city of Boston for the original acquisition of options on the land — later to be sold to the highest bidder (§ 4), for auditing the books of the corporation (§ 5), and perhaps for other purposes.

The difficulty inherent in any attempt to frame a comprehensive definition of public purpose was adverted to in *Allydonn Realty Corp.* v. *Holyoke Housing Authority*, 304 Mass. 288, where an attempt was made to suggest some of the considerations that might have weight. However, in dealing with this difficult subject one proposition is thoroughly established practically everywhere, and so far as we are aware without substantial dissent, and that is that pub-

lic money cannot be used for the primary purpose of acquiring either by eminent domain or by purchase private lands to be turned over or sold to private persons for private use. The leading case in this Commonwealth is *Salisbury Land & Improvement Co.* v. *Commonwealth,* 215 Mass. 371. It is very difficult to distinguish that case from the situation now presented to us. In that case, as in this, privately owned lands over a considerable area were to be taken or purchased by a public commission. There, as here, a part of the land acquired was to be devoted to a use clearly public — a public park and beach, and there, as here, the remainder of the land, comprising apparently a substantial portion of the whole, was to be immediately sold or leased to private owners for private use. The statute was held unconstitutional. Previous opinions of the Justices with reference to similar projects had reached similar conclusions. In *Opinions of the Justices,* 204 Mass. 607, and 204 Mass. 616, the House of Representatives and the Senate respectively were advised that in connection with the laying out in Boston of a proposed great public thoroughfare for trade and commerce land not needed for the way itself could not be taken for sale or lease to private interests for commercial development. Subsequently by art. 39 of the Amendments a limited authority was given for such takings, but the present project is not within the limits of the amendment. See discussion of the two opinions last above cited in *Opinion of the Justices,* 330 Mass. 713, 720–721. A similar view was taken in *Opinion of the Justices,* 211 Mass. 624, where the project involved the use of public money to purchase, build upon, rent, and sell land to provide homes for wage earners. Among the authorities subsequent to the *Salisbury* case may be mentioned *Opinion of the Justices,* 297 Mass. 567, 571, *Machado* v. *Board of Public Works of Arlington,* 321 Mass. 101, *Opinion of the Justices,* 321 Mass. 766, 770, and *McLean* v. *Boston,* 327 Mass. 118, 121.

We are not unmindful of the proposed "Legislative Declaration of Necessity" in § 2 of the act to the effect that

the tax structure of the city is threatened; that the yard will be an area of "economic blight" and "a potential breeding place for crime and juvenile delinquency" and will adversely affect values; that the development of the yard in the manner proposed is "necessary to support the economic well-being of the city and the commonwealth"; that private enterprise will not undertake the orderly and integrated development of the yard, with further recitals setting forth the advantages of the plan. Nevertheless there is no suggestion that the area is now a slum. There is only an apprehension lest it become one. There would seem to be other means, perhaps through building and zoning regulations, of preventing that result. The project is not a slum clearance one, and the principle on which rest such cases as *Papadinis* v. *Somerville,* 331 Mass. 627, *Despatchers' Cafe Inc.* v. *Somerville Housing Authority, ante,* 259, and *Berman* v. *Parker,* 348 U. S. 26, is not applicable. Neither does the area appear as yet to be blighted in any other sense than that high taxes and declining values retard development — a thing that could with equal accuracy be said of a great many tracts of land in Boston and in other cities in the Commonwealth. The main difference between the area we are now considering and such other tracts seems to be that the location of this tract makes it more prominent than many others, and this is hardly a difference in principle. It seems plain that the primary design of the bill is to provide for the acquisition of the area by the use, at the outset at least, of substantial sums of public money and later of comparatively small sums, to formulate a plan for development, including the devoting of some portions of the area to truly public uses, and the return of the remainder to private ownership to be rented or sold for private profit, with the expectation that adjacent areas and the city as a whole will benefit through the increase of taxable property and of values. But this kind of indirect public benefit has never been deemed to render a project one for a public purpose. This aspect of the matter was thoroughly covered in the leading case of *Lowell* v. *Boston,* 111 Mass. 454, at

page 461, cited and quoted in *Opinion of the Justices*, 211 Mass. 624, 625. We do not repeat it here. A careful and sympathetic examination of the proposed act discloses the impossibility of concluding, without flying in the face of long established and well reasoned precedent, that public money spent under its provisions would be spent for a public purpose. We answer question 14 in the negative.

Mr. Justice Lummus has been prevented by illness from taking part in the consideration of the questions and answers.

STANLEY E. QUA.
JAMES J. RONAN.
RAYMOND S. WILKINS.
JOHN V. SPALDING.
HAROLD P. WILLIAMS.
EDWARD A. COUNIHAN, Jr.