# OPINIONS OF THE JUSTICES.

## OPINION OF THE JUSTICES TO THE SENATE AND THE HOUSE OF REPRESENTATIVES.

*Constitutional Law,* Public purpose, Taxation, Redevelopment of land, Opinions of the Justices. *Redevelopment of Land. Taxation,* Real estate tax: exemption.

An answer by the Justices to a question by the General Court with respect to proposed legislation is given by the Justices as individuals in their capacity as constitutional advisors and is not an adjudication by the court; if the question arises subsequently in litigation it must be considered anew by the court.   [748]

Certain proposed legislation, contemplating among other things construction and operation of a public garage to alleviate traffic congestion by the Massachusetts Turnpike Authority on a large site in Boston to be acquired by the Authority by eminent domain or purchase and a long term lease by it which would require the tenant to construct on the site at the tenant's expense an office building, four commercial buildings, a hotel, and other office, commercial or residential units, to be included in the lease, and exempting from taxation the property acquired by the Authority and any leasehold or other interest therein and in lieu of taxation providing for the payment by the Authority of substantial annual "service charges" to the city, did not outline on its face with sufficient completeness and definiteness in many important particulars an overall project for a predominantly public purpose, even though the garage itself would be for a public purpose; and a negative answer must be given by the Justices to a question in substance whether, on the basis of such proposed legislation, the acquisition of the site by the Authority and the tax concessions would be constitutional.   [745, 755–756]

On May 26, 1960, the Justices submitted the following answers to questions propounded to them by the Senate and the House of Representatives.

To the Honorable the Senate and the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit these answers to questions in an order adopted by the Senate and by the House of Representatives on May 4, 1960, and transmitted to us on May 6, 1960. The order refers to the pendency before the General Court of a message from the Governor, House No. 3093, containing a bill, a copy of which was transmitted to us with the order. The bill, relating in part to financial problems in respect of the so called "Prudential center," now under construction in the Back Bay section of Boston, is entitled, "An Act authorizing the Massachusetts Turnpike Authority to finance and construct, in connection with the construction of its turnpike into Boston, a public truck terminal and a public garage in Boston, and providing for operation of such terminal and garage, leasing rights to construct and use building units and other improvements, service charges to the city of Boston, and related matters."

A summary of this lengthy bill adequate to an understanding of the issues will be necessarily somewhat long. There is an emergency preamble, which recites, "The deferred operation of this act would unnecessarily delay construction of the Boston turnpike, public truck terminal and public garage provided for in this act and tend to defeat its purposes of serving the convenience and needs of the users of the Massachusetts Turnpike and Municipal Auditorium and of improving vehicular transportation and service in the city of Boston, relieving the pressing demands for increased traffic facilities, reducing the present congestion of traffic on the streets in the city and limiting the hazards and handicaps thereof which otherwise will become more serious and dangerous to the public health and safety and facilitating the construction and financing of the Boston turnpike, public truck terminal and public garage . . . ."

The bill (§ 1) declares (a) that the construction of the Boston turnpike extending from the easterly terminus in Weston of the turnpike heretofore constructed under St. 1952, c. 354, to a point or points in Boston "will greatly relieve the pressing demands for increased traffic facili-

ties''; (b) that the construction of a public truck terminal adjacent to and connected with the Boston turnpike and of a public garage for the off street parking of motor vehicles having access to the Boston turnpike, to adjacent public streets, and to the proposed Boston municipal auditorium,[1] will reduce the present congestion of traffic on streets; (c) that it is necessary that the Massachusetts Turnpike Authority ''acquire fee interests'' in the sites of the truck terminal and garage; (d) that ''it is necessary to provide for the construction of building units and improvements above portions of the garage at various levels to make possible the financing of the garage and to make the best and most economic use of the garage site for the general welfare of the city and the commonwealth''; (e) ''that the public interest requires retention of public ownership and control of the entire site and further requires such construction be on a leasehold basis''; (f) that financing by private interests would not be obtainable for such units and improvements without the tax exemption set forth in § 8; and (g) that the construction of the building units and improvements will greatly promote the public welfare of the city and surrounding communities and greatly increase the revenues which will accrue from the Boston turnpike, ''thereby making feasible the financing of the truck terminal, the garage and the rest of the Boston turnpike.''

Section 2 contains definitions, some of which are obvious. Others are not, and should be noted. ''Boston turnpike'' is really the name for the whole project: the toll expressway extension, approaches, concessions, truck terminal, garage site, public garage, buildings, improvements, easements and the like (§ 2 [b]). ''Cost of the Boston turnpike'' excludes the costs and expenses of the building units constructed by tenants pursuant to §§ 5 and 6 (§ 2 [d]). ''Garage'' or ''public garage'' shall mean a covered facility or facilities of one or more levels on the garage site for parking, and, if the Authority so determines, for servicing

---

[1] *Boston* v. *Merchants Natl. Bank*, 338 Mass. 245. St. 1954, c. 164, as amended by St. 1957, c. 718.

and repairing motor vehicles, and for open air parking areas. The facility or facilities are to be designed to accommodate at least 2,500 passenger automobiles, and to cover and enclose substantially all the garage site, including the locations of the turnpike highway and the Boston and Albany Railroad crossing the site (§ 2 [e]). "Garage site" shall mean the land in Boston which is now owned by The Prudential Insurance Company of America,[1] bounded northerly on Boylston Street, easterly and northerly on land of Hotel Lenox, Inc., easterly on Exeter Street, southeasterly on Huntington Avenue, southwesterly on Belvidere Street, westerly on Dalton Street and land of the city, and northerly and westerly on land of the city, together with such adjoining land or interests in adjoining land as the Authority may acquire in the event of the relocation of the said public streets (§ 2 [f]). This we know includes the site of the demolished Mechanics Building. See *Boston* v. *Merchants Natl. Bank,* 338 Mass. 245, 247. "Tenant" shall mean Prudential or any other person with whom the Authority may make the initial lease, its successors and assigns (§ 2 [h]). "Truck terminal" or "public truck terminal" shall mean a facility to be constructed on such site in the Brighton district of Boston adjacent to the toll expressway as the Authority shall determine (§ 2 [i]).

The Authority is "authorized and empowered, subject to and with the benefit of the provisions of this act and the privileges and immunities conferred upon it" by St. 1952, c. 354, as amended, "to acquire, construct, maintain, repair and operate the Boston turnpike" (§ 3); to acquire the truck terminal site and the garage site and, in general, "without obtaining a license or permit of any kind," to arrange for their construction and operation by the Authority or by others under contract or lease (§ 3 [a]); "to proceed with acquisition, financing and construction of the garage, the truck terminal and other parts of the Boston turnpike in such stages and order and together or sepa-

---

[1] A mutual life insurance company of New Jersey, authorized to conduct business in the Commonwealth, and its successors and assigns (§ 2 [g]).

rately, as the Authority shall determine" (§ 3 [f]); and to issue revenue bonds (§ 3 [c]). The bonds are to be "payable solely from revenues," presumably solely of the Boston turnpike, "to finance all or any part of the cost of the Boston turnpike as a separate turnpike." Certain details of the bond issue and a trust agreement between the Authority and a corporate trustee are authorized. There is a provision that ultimately "the turnpike heretofore constructed and the Boston turnpike shall be combined as a single project" (§ 4).

The Authority is authorized and empowered to acquire the garage site or any interest or interests therein by eminent domain, or "by purchase with the benefit of and subject to any rights, easements and agreements approved by the Authority, at a price for any interest acquired from Prudential not exceeding the cost thereof to Prudential as determined by the Authority"; to "permit building units and improvements required or permitted by this section [5] to be constructed on and above one or more levels of the garage wherever it [shall have] determined from time to time that such units and improvements may be so constructed and used without undue interference with the public purposes of the garage and turnpike"; and to lease to a tenant or tenants for terms not extending beyond December 31, 2040, "at such rentals and on such conditions . . . as the Authority shall determine." The initial lease shall be to a single tenant and of all the building units and improvements. It shall contain provisions permitting the tenant, if the Authority so elects, to construct the garage for the Authority, and in the event of such election requiring the Authority to pay the tenant the cost, "excluding the cost of foundations to bedrock." The annual rental prior to December 31, 2000, "shall be at least sufficient, in the opinion of the Authority, to enable it to recover its entire original investment in the garage, including the acquisition of the garage site," after provision for all expenses, service charges to the city under § 7, and interest; and subsequent to that date an amount equal to the said

service charges.   There is no provision for any action if
the original estimates are too low.   The lease shall contain
provisions, among others, "indemnifying the tenant against
the payment by it of any taxes hereafter assessed by the
commonwealth or any political subdivision thereof upon
the garage site or any improvements thereon or interest
therein and any payment imposed in lieu of any such tax;
requiring the tenant to remain liable upon all its covenants
contained in the lease throughout its entire term and any
extensions thereof notwithstanding any assignment or
mortgage"; and such other provisions as the Authority
shall approve.   The amounts received by the Authority
under any such lease on account of the service charges pay-
able to the city shall be paid to the trustee under the trust
agreement provided for in § 4 to be used only to make the
payments required under § 7.   The initial lease shall re-
quire the tenant to construct at its expense on the garage
site certain building units above portions of the garage at
various levels thereof: an office building of at least forty-
five stories and a rentable floor area of not less than 800,000
square feet; four commercial buildings containing an ag-
gregate rentable floor area of not less than 170,000 square
feet; a hotel containing not less than twenty stories and not
less than 900 rooms; and other building units, designed for
office, commercial, or residential purposes, containing in
the aggregate a rental floor area of not less than 500,000
square feet (§ 5).

Section 6 contains a relaxation of the Boston building
code and of the applicable statutory provisions for the sale
of alcoholic beverages at the garage site, the Authority
having the exclusive power of supervision and enforcement
of the building provisions.

"The city shall render to the garage site and improve-
ments thereon municipal services (including fire but not
police protection) in the same manner as such services are
rendered to other properties in the city.   The city shall in
like manner also furnish police protection to the portions
of the garage site leased" under § 5.   For such services

and protection the Authority shall, in addition to payment of the regular established charges for municipal utilities or other particular services, pay to the city service charges on or before October first in each year: for the year beginning in 1961 $600,000, and for the year beginning in 1967 $2,550,000, with gradually increasing amounts in the intervening years; for each year after 1967 through 2040 $3,000,000, and if in any of these years the aggregate of twenty per cent of the gross rentals received by the tenants plus $250,000 exceeds $3,000,000, the Authority shall pay the city an additional service charge equal to such excess. "Gross rentals" comprise (1) all rentals and revenues for space occupancy other than of the garage; and (2) payments for space occupied by tenants "for purposes not directly related to the construction, alteration, maintenance, repair, operation or management of the garage site computed at the minimum rate of six dollars per year." There is an upward escalator clause (§ 7).

Section 8 exempts from taxes and assessments property acquired by the Authority under the proposed act "or any other act" and the income therefrom, and "neither such property nor any leasehold or other interest therein shall be taxed to a lessee or occupant" under G. L. c. 59, §§ 3A and 11. These provisions are made a contract between the Commonwealth on the one hand and the Authority and its tenants on the other, and are not to be amended "unless adequate compensation shall be made by the commonwealth to all those adversely affected."

The Authority is not to be dissolved until all bonds issued under the proposed act and St. 1952, c. 354, have been paid, or provision has been made for their payment, and until all leases under § 5 have expired. During its existence the Authority is to retain title subject to an easement in the Commonwealth of the turnpike highway passing through the garage site. Upon its dissolution the Authority is to convey the garage site and the equipment of the garage to the city (§ 9).

Section 10 sets up a procedure for the reimbursement of the Authority by the Commonwealth for any indemnifica-

tion payments it may be called upon to make to tenants because, of any taxes imposed upon tenants. The Authority is to certify the amounts to the State Treasurer, who, pursuant to G. L. c. 59, may borrow in anticipation of the assessment to be levied upon the city. This section is deemed to constitute a contract between the Commonwealth and the Authority, and no amendment shall be made which will affect adversely the interests or rights of the Authority, its tenants, and its bondholders.

Section 11 deals with the eligibility of the bonds for investment. Section 12 provides for liberal construction of the proposed act. Section 13 declares inapplicable all inconsistent laws and G. L. c. 149, §§ 44A to 44L, inclusive, relating to bidding on public works.

The questions are these:

"1. Is it constitutionally competent for the General Court in order to meet the needs declared by Section 1 of the bill to authorize the Massachusetts Turnpike Authority to acquire, as provided in Section 5 of the bill, the garage site defined in Section 2 of the bill for the purpose of constructing a public garage designed as provided in said Section 5: (A) by exercise of the power of eminent domain? (B) by purchase?

"2. If the answer to either part of question 1 is in the affirmative, is it constitutionally competent for the General Court to authorize the Authority to lease in the manner and upon the terms provided in Section 5 of the bill building units and improvements constructed on and above one or more levels of the garage?

"3. Do the provisions of Sections 5 and 6 of the bill (i) which authorize the Authority to acquire by eminent domain or purchase the garage site (defined in Section 2 (f) of the bill) and to permit the tenant (defined in Section 2 (h) of the bill) to construct the garage (defined in Section 2 (e) of the bill) for the Authority and (ii) which detail the specifications for the building units and improvements to be constructed by and for the tenant and (iii) which require the tenant to construct the build-

ing units and improvements so specified and which are to be leased to the tenant for private purposes and (iv) which require the Authority to indemnify the tenant against the payment by it of any taxes assessed by the Commonwealth or any political subdivision thereof upon the garage site or any improvements thereon or interest therein and any payment imposed in lieu of any such taxes, constitute (A) a loan of the credit of the Commonwealth to or in aid of a private corporation in violation of the provisions of Article 62, Section 1 of the Amendments to the Constitution of Massachusetts or (B) an excessive delegation of legislative powers?

"4. Is it constitutionally competent for the General Court to authorize the Authority, as provided in clause (f) of Section 3 of the bill, to proceed with acquisition, financing and construction of the garage, truck terminal and other parts of the Boston Turnpike in such stages and order and together or separate as the Authority shall determine?

"5. In view of the provisions of Sections 5 and 6 of the bill referred to in question 3 and the provisions of clause (f) of Section 3 of the bill authorizing the Authority to proceed with acquisition, financing and construction of the garage, truck terminal and other parts of the Boston Turnpike in such stages and order and together or separate as the Authority shall determine would the issuance of bonds by the Authority for paying the cost of acquiring the garage site and of constructing the garage, although some circumstances might delay or prevent the construction of the turnpike highway and the truck terminal, be for a proper public purpose?

"6. Is it constitutionally competent for the General Court to grant the tax exemptions provided in Section 8 of the bill particularly in view of the provisions of the Constitution of Massachusetts, Part the Second, Chapter 1 Section 1 Article IV: (A) with respect to the revenue bonds to be issued by the Authority? (B) with respect to all property of the Authority leased to or oc-

cupied by others pursuant to Section 5 of the bill?    (C) with respect to the leasehold interest of the tenant in such property?

"7.    Is it constitutionally competent for the General Court as provided in Section 10 of the bill:    (A) to authorize the Authority to certify to the State Treasurer the amount of the payment of any indemnification to the tenant?    (B) to require the Commonwealth to pay over to the Authority the amount so certified?    (C) to authorize the State Treasurer to borrow the amount so paid over and to assess such amount upon the City of Boston?

"8.    Is it constitutionally competent for the General Court to enact:    (A) the last sentence of Section 8 of the bill?    (B) the last sentence of Section 10 of the bill?

"9.    Will the provisions of Section 8 of the bill and the provisions of Section 10 of the bill come within the contract impairment clause of the Federal Constitution (Article 1, Section 10)?

"10.    Does Section 3 of Article LXII of the Amendments to the Constitution of the Commonwealth require a two-thirds vote of each house:    (A) because of the provisions of Section 8 of the bill?    (B) because of the provisions of Section 10 of the bill?    (C) because of the provisions of Section 4 of the bill which may delay the Commonwealth's acquisition of some portion of the turnpike heretofore constructed or of the Boston Turnpike defined in Section 2 (b) of the bill and which authorizes the Authority to combine as a single project for financing purposes the turnpike heretofore constructed and the Boston Turnpike upon the retirement of all the bonds issued for one or the other and the continuance of tolls on the combined project until all revenue bonds then outstanding shall have been paid?"

The Governor's message points out that "The Authority has conferred at length with the Prudential and has developed an arrangement, formally approved in principle" by Prudential; and that Prudential "has formally voted and publicly stated that if the proposed legislation, including

the tax exemption and indemnity provisions, is enacted and its constitutionality assured by an advisory opinion, it will go ahead with its part of the project.'' In this connection, we quote from *Commonwealth* v. *Welosky,* 276 Mass. 398, 400, where Chief Justice Rugg said for the court, ''It has been uniformly and many times held that such opinions, although necessarily the result of judicial examination and deliberation, are advisory in nature, given by the justices as individuals in their capacity as constitutional advisors of the other departments of government and without the aid of arguments, are not adjudications by the court, and do not fall within the doctrine of stare decisis.'' If the same question arises later in the course of litigation, it is the duty of the court to consider it anew, unaffected by the advisory opinion. *Bowe* v. *Secretary of the Commonwealth,* 320 Mass. 230, 245, note. *Lincoln* v. *Secretary of the Commonwealth,* 326 Mass. 313, 314.

Recitals in the order demonstrate that the underlying reason is apprehension as to the tax status of a building project presently under way on the garage site. References to the holdings of certain judicial decisions and to the opinions expressed in certain Opinions of the Justices are followed by this statement:   ''The application of the foregoing principles of law, and of the provisions of Part the Second, Chapter 1, Section 1, Article IV of the Massachusetts Constitution and of Sections 1 and 3 of Article LXII of the Amendments to the Massachusetts Constitution and of the provisions of Article XIV of the Amendments to the United States Constitution, may depend to a substantial degree upon the circumstances of each case, and their application to the provisions of the bill and the actions authorized thereby, in view of the opinions expressed in *Opinion of the Justices,* 332 Mass. 769, which dealt with part of the area defined as the garage site in the bill, is not clear.''

The order rightly intimates that the development of constitutional principles in this Commonwealth has made the determination whether a given project is predominantly for a public purpose dependent upon the circumstances of each

individual case. In *Allydonn Realty Corp.* v. *Holyoke
Housing Authy.* 304 Mass. 288, 292–293, many of our cases
were cited with the following deductions: "Some of these
cases have become generally recognized as leading cases.
They do not, however, establish any universal test. Each
case must be decided with reference to the object sought to
be accomplished and to the degree and manner in which
that object affects the public welfare. Frequently an ob-
ject presents a double aspect in that it may in some respects
result in conferring a benefit upon the public and in other
respects it may result in conferring a benefit upon or in
paying money to private individuals. In such instances
the cases tend to distinguish between those results which
are primary and those which are secondary or incidental
and to classify the object according to its primary conse-
quences and effects. At any rate it is plain that an expend-
iture is not necessarily barred because individuals as such
may profit, nor is it necessarily valid because of incidental
benefit to the public."

The obvious starting point for precise constitutional dis-
cussion is *Opinion of the Justices,* 332 Mass. 769, given in
1955, which, as noted in the order, dealt with part of the
area presently defined as the garage site. There the pro-
posed act related to the development of about twenty-eight
acres, principally the Boston and Albany Railroad yard.
That proposal also was somewhat complicated. A city de-
velopment commission was to be established to acquire the
area and by competitive bidding to sell options to purchase
lands within it, such options to be sold as a unit to the high-
est responsible bidder. The successful bidder was to form,
under G. L. c. 156, a corporation to which the options were
to be conveyed. The corporation was to exercise the op-
tions and to submit to the commission a plan showing (1)
the portions of the land to be devoted to public ways, pub-
lic parks, public buildings, or other public uses, including a
convention hall or civic auditorium, and (2) the proposed
subdivision of the remainder into lots for private uses.
After approval by the commission following submission to

the planning board and other city boards, all lands devoted
to the public uses were to be conveyed for a nominal con-
sideration to the city, which might purchase the convention
hall by paying the construction cost without including the
value of the land.    Special and unusual provisions were
made as to taxation of the real estate of the corporation.
For the first five years the assessed valuation was to be
$5,670,000, no matter how much value might be added in
new construction.    After the first five years tax collection
or foreclosure might be postponed for a period which might
be substantial, conceivably as long as forty-five years, and
in certain circumstances perhaps never.    The taxes, more-
over, were to be limited according to a complicated formula
bearing no relationship to the fair cash value of the prop-
erty.    Other tax advantages need not be described.

The questions submitted were answered unfavorably to
the proposal.    The Justices reached these conclusions,
among others:    (1) In art. 10 of the Declaration of Rights,
which reads, "Each individual of the society has a right to
be protected by it in the enjoyment of his life, liberty and
property, according to standing laws.    He is obliged, con-
sequently, to contribute his share to the expense of this pro-
tection . . . ," the words "his share" "forbid the imposi-
tion upon one taxpayer of a burden relatively greater or
relatively less than that imposed upon other taxpayers"
(p. 777).    (2) When the Constitution, Part II, c. 1, § 1, art.
4, empowers the General Court "to impose and levy propor-
tional and reasonable assessments, rates, and taxes, upon
all the inhabitants of, and persons resident, and estates
lying, within the said commonwealth . . . ," the expres-
sion "proportional and reasonable" forbids the imposition
of taxes upon one class of persons or property at a different
rate from that which is applied to other classes.    The Jus-
tices quoted from *Cheshire* v. *County Commrs. of Berk-
shire,* 118 Mass. 386, 389, and cited many authorities includ-
ing *Opinion of the Justices,* 324 Mass. 724 (pp. 778–779).
(3) The provisions whereby valuations were to remain the
same for five years, regardless of the values added by build-

ings, while taxpayers in general were required to pay annually upon total value, charged the corporation with less than its share of the public expense, necessarily produced disproportion, were unreasonable in the constitutional sense, and were unconstitutional (p. 779). (4) The provisions by which taxes payable by the corporation in any year were in part dependent upon profits, and by which payment might be deferred as long as forty-five years and in certain contingencies might even never be made and the special provisions as to interest and as to application for abatement without paying any part of the tax, while other taxpayers must pay annually on full value without regard to profit and without special advantages as to interest and abatements, resulted in charging the corporation with less than its share of the public expense, produced disproportion, and were unreasonable and unconstitutional (p. 779). (5) Taxing the property of the corporation upon a different and more favorable basis than that upon which similar property of other owners would be taxed would violate the equal protection clause of the Fourteenth Amendment (p. 780).

In sum, the 1955 project, as planned, was viewed by the Justices as presenting a private, and not a public, purpose. The bill did not purport to be set up for any public purpose of urban development and renewal. Their opinion closed in the following language: "Neither does the area appear as yet to be blighted in any other sense than that high taxes and declining values retard development — a thing that could with equal accuracy be said of a great many tracts of land in Boston and in other cities in the Commonwealth. The main difference between the area we are now considering and such other tracts seems to be that the location of this tract makes it more prominent than many others, and this is hardly a difference in principle. It seems plain that the primary design of the bill is to provide for the acquisition of the area by the use, at the outset at least, of substantial sums of public money and later of comparatively small sums, to formulate a plan for development, including

the devoting of some portions of the area to truly public uses, and the return of the remainder to private ownership to be rented or sold for private profit, with the expectation that adjacent areas and the city as a whole will benefit through the increase of taxable property and of values. But this kind of indirect public benefit has never been deemed to render a project one for a public purpose. This aspect of the matter was thoroughly covered in the leading case of *Lowell* v. *Boston,* 111 Mass. 454, at page 461, cited and quoted in *Opinion of the Justices,* 211 Mass. 624, 625. . . . A careful and sympathetic examination of the proposed act discloses the impossibility of concluding, without flying in the face of long established and well reasoned precedent, that public money spent under its provisions would be spent for a public purpose'' (pp. 783–784).

In *Opinion of the Justices,* 334 Mass. 760, the views were expressed that the redevelopment of a ''blighted open area,'' as defined in the urban redevelopment corporation law, G. L. c. 121A, is a public purpose; and that a proposed exemption of the real and tangible personal property of such corporations from ordinary property taxes and the substitution of excise taxes payable to the Commonwealth and distributable to the respective municipalities would be valid. It was noted that these are not ordinary business corporations but are declared by the statute to be ''instrumentalities of the commonwealth''; that their stockholders may receive dividends limited to six per cent; that their activities are strictly confined to the execution of projects authorized by the housing board and approved by the local planning boards and mayors or selectmen ''for the construction and maintenance of decent, safe, and sanitary dwellings upon substandard, decadent or blighted open areas which have been acquired or cleared in accordance either with the housing authority law or with c. 121A itself''; and that they are subject in many respects to the control of public authorities (p. 762). The opinion was expressed that since ''urban redevelopment corporations, although in a sense private corporations, perform functions

for the public benefit analogous to those performed by various other types of corporations commonly called public service corporations, property owned by them and used in such service may receive favored treatment in the matter of taxation" (p. 763). The situation dealt with in *Opinion of the Justices*, 332 Mass. 769, was distinguished as having presented a plan of tax exemption assistance to a project for a predominantly private purpose. "In that instance, although the proposed plan had some public aspects, the dominating purpose was resale to private interests to which some of the tax advantages were to be extended. The elimination of slums or blighted areas was not the primary object of the proposed statute. In the present instance the tax advantages are to continue only so long, not exceeding forty years, as the project continues to be operated under public regulation and for the public benefit" (p. 764).

Turning directly to the matter at hand, we note that the garage is undoubtedly for a public purpose. *Lowell* v. *Boston*, 322 Mass. 709, 737. *Cabot* v. *Assessors of Boston*, 335 Mass. 53, 58–59. *Court St. Parking Co.* v. *Boston*, 336 Mass. 224, 229. And so, by analogy, is the truck terminal, which in a location in Brighton could have only incidental bearing upon the issues relating to the Prudential center. The turnpike is likewise devoted to a public purpose. *Opinion of the Justices*, 330 Mass. 713. *Luke* v. *Massachusetts Turnpike Authy.* 337 Mass. 304. In determining the extent to which an obvious private benefit to be conferred upon Prudential or some other tenant affects the public character of the entire project, we can give but little, if any, weight to the turnpike or the truck terminal, both of which are merely authorized and not required, or to the "proposed Boston municipal auditorium." Otherwise, an omnibus statute might contain a number of undoubted public purposes as optional activities which, on paper, might outweigh its private aspects, but which in administration might never be put into operation.

In excluding the turnpike from consideration, we do not perceive wherein its inclusion would cause any change in

the result as to constitutionality, although it well might have important makeweight value to those who, unlike ourselves, are concerned with the determination of a policy. In passing, we note the somewhat complicated provisions of the bill which may postpone the ultimate transfer of the garage project to the city until the discharge of the indebtedness for the Boston turnpike and of certain other indebtedness of the Authority, and so have the effect of discounting to an even lower figure the present small value of the city's interest as ultimate owner of the garage site.

The fact stands out that the Authority, which is "authorized and empowered" (§§ 3–5), is not required to do anything under the proposed act unless it so elects. To the extent that it may elect, it must, of course, conform to whatever may be prescribed. Let us assume for the purpose of reasonable discussion that the Authority acquires, by purchase or eminent domain, the garage site. If we then omit from the preamble all reference to the turnpike, auditorium, and truck terminal, little is left beyond the statement that the garage is necessary for the improvement of traffic conditions in the city, traffic conditions to which the development of the center would make its own contribution.

Above portions of the garage, it is contemplated to erect (1) an office building of at least forty-five stories with a rentable floor area of not less than 800,000 square feet; (2) four commercial buildings with an aggregate rentable floor area of not less than 170,000 square feet; (3) a hotel of at least twenty stories and not less than 900 rooms; and (4) other building units designed for office, commercial or residential purposes which shall contain in the aggregate a rentable floor area of not less than 500,000 square feet. These additions to the real estate are to be given the benefit of a special contract providing for the annual payment of gradually increasing fixed sums in lieu of taxes for the years 1961 to 1967, inclusive, which probably would cover the period of construction; and for each year from 1968 through 2040, the payment of $3,000,000 plus any additional amount derived from a formula based on gross rentals as

defined in the proposed act. In apparent support of the aspect of fixed charges in lieu of taxes, there is a recital in the order that in this Commonwealth assessors cannot tax a building apart from the land it occupies, citing *Dehydrating Process Co. of Gloucester, Inc.* v. *Gloucester,* 334 Mass. 287, 292–293. See *Gloucester Community Pier Assn. Inc.* v. *Dehydrating Process Co. of Gloucester, Inc.* 339 Mass. 14, 16. This rule of practice, created by statute, can be modified by statute, and has been so modified as to land owned by the United States and leased to private interests. G. L. c. 59, § 11, as amended by St. 1956, c. 690, § 2. There need be no constitutional obstacle to other statutory modifications, which are not arbitrary, unjust, or discriminatory. See *Dehydrating Process Co. of Gloucester, Inc.* v. *Gloucester,* 334 Mass. 287, 293. See also *Massachusetts Gen. Hosp.* v. *Belmont,* 233 Mass. 190, 200–205.

We have endeavored to state an adequate background for discussion of question 1. Our answer involves a determination whether, on balance, the garage purpose alone is enough to justify the relaxation of constitutional mandates with resulting benefit to the private interests which now own the garage site and seemingly are in a state of hesitation as to the completion of contemplated improvements. The question mentions (1) the exercise of the power of eminent domain and (2) purchase. While taxation is not specified, the allusions to the pending bill amply embrace the subject. The two matters here go along together. *Allydonn Realty Corp.* v. *Holyoke Housing Authy.* 304 Mass. 288, 297. Both are within the scope of the question.

In the precise form in which question 1 is presented, based upon House No. 3093, we are constrained to answer in the negative. Our difficulties are twofold. (1) The 1960 project, as outlined in this bill, is not made to appear so unlike that of 1955 as to disclose distinguishable characteristics which would warrant a different conclusion or would elude many cogent precedents cited in *Opinion of the Justices,* 332 Mass. 769. (2) The 1960 project is not definite enough in respects which might be important to enable us to

express our opinion as to whether it may nevertheless be for a public purpose. We shall consider these difficulties in order.

(1) The 1955 project concerned mainly the abandoned, or to be abandoned, railroad yard. The present project relates to a somewhat larger area, which includes the railroad yard and the site of the demolished Mechanics Building. In each case there is provision for an intervening organization between the city and those who will be the substantial owners: a new city development commission created for this special purpose in the former, the Massachusetts Turnpike Authority in the latter. In each case are found individual tax concessions (called service charges in the present bill): an agreed amount or amounts for five years in the former, and for seven years in the latter; and thereafter in both cases for a much larger number of years, the total amounts not fixed at an exact figure but each to be computed according to a formula applicable to it. In the 1955 project that larger number of years might be forty-five, with a possibility of the taxes never being paid in certain contingencies. Here that number may run beyond 2000 after the cost of the garage shall have been recaptured pursuant to § 5. In the earlier project title to part of the area was to be conveyed ultimately to private purchasers, who were necessarily not yet identified. Here the present owner is the probable tenant, and the ultimate owner of much of the area is to be the city, although its title cannot begin before 2040 A.D., when, subject to possible postponement, the Authority is to convey to it both "the garage site" (subject to a turnpike easement in the Commonwealth) and the personal property used for operation of the garage (§ 9). Thus, although the Authority is "a public instrumentality," and its exercise of the powers conferred by St. 1952, c. 354, § 3, "in the construction, operation and maintenance of the [Massachusetts] turnpike shall be deemed and held to be the performance of an essential governmental function," and by § 3 of the proposed bill the "Authority is authorized and empowered" to act with "the privileges and immunities

conferred upon it'' by c. 354, its occupancy of the garage site (as distinguished from the garage) will not be for its own purposes, and until 2040 the occupancy will be that of private tenants. Both bills stress the unavailability of private capital. The 1955 bill contained a declaration ''that private enterprise without the aids provided in the act will not undertake orderly and integrated development'' (332 Mass. at p. 770). The present bill declares ''that financing by private interests would not be obtainable for such units and improvements constructed on such basis without the tax exemption set forth in section eight'' (§ 1 [f]). The declaration in § 1 (d) that it is necessary to construct the building units ''to make possible the financing of the garage and to make the best and most economic use of the garage site for the general welfare of the city and the commonwealth'' evokes this comment. Commercial leasing is not limited to an amount necessary to finance the garage. The closing phrase is very similar to a declaration in the 1955 bill: ''necessary to support the economic well-being of the city and the commonwealth.'' In summary, we see no preponderating advantage of either bill over the other as being for a predominantly public purpose.

(2) We enumerate respects in which the bill is lacking in needed definiteness. Nothing in the preamble declares urban development and renewal to be a public purpose. No question in the order indicates such reliance. Perhaps notwithstanding *Opinion of the Justices*, 334 Mass. 760, such a declaration was thought to be futile after the opinion in 332 Mass. 769. But now there may be a possibility of making more than a suggestion of such a purpose. The bill contains one, and only one, reference to the Boston and Albany Railroad. This is in § 2 (e) in the definition of ''garage'' which is prescribed ''to cover and enclose substantially all of the garage site, including the locations of the turnpike highway and the Boston and Albany Railroad crossing the site.'' We are without recitals as to the future of the railroad yard. This railroad, we know judicially, is maintaining very limited passenger service and has re-

cently sought to withdraw from intrastate passenger service altogether. Its yard, along with the rest of the garage site, lies in the path of the growth of the city, a growth which perhaps should not be long deferred. There may be other facts, too, of which we are not informed, including some coming to light since 1955. They could disclose a condition, the elimination of which would so affect the inhabitants "as a community, and not merely as individuals" (*Lowell* v. *Boston,* 111 Mass. 454, 470, *Opinion of the Justices,* 150 Mass. 592, 595, *Opinion of the Justices,* 237 Mass. 598, 609, *Opinion of the Justices,* 297 Mass 567, 571) that a corporation confided with the performance of that service might be judicially considered to "perform functions for the public benefit analogous to those performed by various other types of corporations commonly called public service corporations." See *Opinion of the Justices,* 334 Mass. 760, 763. "Such corporations, as has been held in a long line of decisions, may receive favored treatment in the matter of taxation." *Opinion of the Justices,* 335 Mass. 771, 773.

There is no provision in the proposed arrangement which resembles a procedure whereby earnings of a public utility are currently subject to regulation by public authority. The act contains inadequate detail as to Prudential's participation. There is no means for reviewing the earnings for the first seven years or to revise an agreed rental approved by the Authority should it prove too low. It is not clear what will happen should there be a default by the tenant before the erection of the buildings is completed, and what would be the respective rights of the city and the Authority. There are no provisions as to insurance, use, assignment, tort liability, repair and maintenance during the lease, or the condition of the premises at the expiration of the lease. Nothing is said as to the application of the State administrative procedure act, G. L. c. 30A, or other review of the acts of the Authority in applying clearly defined statutory standards. Indeed, the proposed bill does not set forth standards sufficient to permit a determination of the reasonableness of the tax concessions in relation to the public interest.

Where the whole scheme is not distinctly defined in the proposed statute, the determination as to whether it constitutes a public purpose is in the domain of speculation. It is not enough to make this bill constitutional to recognize that problems of urban planning, development and renewal are increasingly in the area of public interest and that new forms for public participation in their solution may be within constitutional limits. This bill does not provide its own clear statement as to what it requires. We observe no reason why this might not be done. If there is to be a delegation of authority to approve, the details or standards for approval must be specified, and any action must be made subject to review of the adequacy of compliance with standards. The project must be demonstrably of a character reasonably justifying separate classification and treatment for tax exemption. It not only must in fact be, but on the face of the statute it must be, for a predominantly public purpose.

To question 1 we answer "No." The other questions are so interwoven with question 1 that no answers are presently required. We must answer only with respect to the pending bill. *Opinion of the Justices,* 313 Mass. 779, 781. Many of the questions if directed to an appropriate bill relating to a clearly defined project for a public purpose would present themselves in a different aspect.

<div align="right">

RAYMOND S. WILKINS
JOHN V. SPALDING
HAROLD P. WILLIAMS
EDWARD A. COUNIHAN, JR.
ARTHUR E. WHITTEMORE
R. AMMI CUTTER