TOWN OF SAUGUS vs. REFUSE ENERGY SYSTEMS COMPANY.

Essex.  December 10, 1982. — April 15, 1983.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Municipal Corporations,* Contracts.  *Taxation,* Real estate tax:  assess-
ment; Contract to pay taxes.  *Contract,* With municipality, To pay
taxes, Validity.  *Estoppel.  Laches.  Practice, Civil,* Appeal.

Provisions in certain contracts between a taxpayer and a town precluding
the taxpayer from challenging $20 million of its real property tax as-
sessment, thus potentially subjecting it to disproportionately high taxes
by the imposition of a fixed tax regardless of the actual value of its
property, were illegal and unenforceable. [826-830]
The record of an action by a town seeking a declaratory judgment pro-
hibiting a taxpayer from challenging $20 million of its real property
tax assessment supported the judge's conclusion that neither estoppel
nor laches barred the taxpayer from claiming that certain contracts it
had entered with the town, precluding it from contesting that portion
of its assessment, were illegal. [830-831]

CIVIL ACTION commenced in the Superior Court Depart-
ment on September 15, 1980.

The case was heard by *Bennett, J.*

The Supreme Judicial Court granted a request for direct
appellate review.

*J. Owen Todd* for the plaintiff.

*Herman Snyder (Steven J. Comen* with him) for the de-
fendant.

ABRAMS, J.  The town of Saugus (town) brought this ac-
tion seeking a declaratory judgment prohibiting the defend-
ant, Refuse Energy Systems Company (company), from
challenging $20 million of its $24.4 million property tax
assessment.  The town claims that the company is bound by
contracts it entered into with the town prior to the issuance
of industrial revenue bonds used for the construction of a

solid waste disposal facility. In those contracts, the company agreed not to challenge up to $20 million of the assessed value of its property for three years, beginning January 1, 1976. A Superior Court judge determined this provision of the contracts to be illegal. We granted the town's application for direct appellate review. We affirm.

We summarize the facts. The defendant company is a joint venture between M. DeMatteo Construction Co. (DeMatteo) and Wheelabrator Energy Systems Inc., a subsidiary of Wheelabrator-Frye Inc. DeMatteo had operated an open dump for about seventeen cities and towns from 1960 through 1975 on land in Saugus, pursuant to a municipal license. Due to complaints about pollution and dangerous conditions at the dump, the town ordered it closed in 1967. The Governor then declared an emergency and ordered the dump to remain open. After litigation between DeMatteo and the town, the town issued an interim license for the dump in October, 1971, based on the condition that DeMatteo construct a solid waste incineration facility to replace the dump.

Also in 1971, the Legislature amended existing development statutes to permit industrial revenue bond financing to be used for solid waste disposal facilities. See St. 1971, c. 1017; G. L. c. 40D. The town began to take steps to use these bonds to finance a solid waste incineration facility through the Saugus Industrial Development Financing Authority (authority). Originally this facility was proposed by an entity known as THESCO, jointly formed by DeMatteo and Combustion Engineering Company.

By December, 1972, the town's selectmen had approved the project, and the authority had recommended the project for approval by the Commonwealth and had voted its bond resolution, approving a $33 million bond financing. When the company replaced THESCO in 1973 and continued the project, the town's selectmen and the authority voted again to approve the bond financing.

The company began construction of the facility after it had received a building permit and had spent almost $15

million on the project by the fall of 1974. Before the
authority would give the company financing of $15.5 mil-
lion through an interim bond issue, it indicated that the
company should agree to terms desired by the town. The
company and the town signed a contract on February 26,
1975 (original contract), and the interim bonds were issued
shortly thereafter. The original contract provided that the
company would "not challenge a real estate assessment by
the Town of Saugus of all property owned by [the company]
including but not limited to land, buildings, and equipment
up to and including twenty million dollars ($20,000,000) as
the assessed value for a period of three years beginning
January 1, 1976." In addition, the company agreed to
withdraw its pending appeals of real estate taxes before the
Appellate Tax Board; not to seek to be classified as a manu-
facturing facility for tax purposes; to charge the town lower
rates for incinerator privileges than it would charge any
other town; to build several ponds for the town; and to per-
mit free dumping for the town at DeMatteo's landfill in
Saugus. In return, the town agreed to promote issuance of
the bonds and to continue to license the facility.

To complete the project, the company needed another
$30 million bond financing to refinance the interim bond
issue and to provide additional construction funds. How-
ever, prior to this bond issue, the Legislature passed
St. 1975, c. 500, which substituted an excise tax of one
dollar for each ton of processed solid waste for the property
taxes payable on buildings and equipment. See G. L. c. 16,
§ 24A. This statute contained a grandfather clause, stating
that the substitute tax would not apply to a facility owner
who had "negotiated agreements containing arrangements
relating to real estate taxes or assessments with a city or
town" prior to the effective date of the act. St. 1975,
c. 500, § 5. The authority, desiring the company to fall
within the grandfather clause, refused to issue the $30
million worth of bonds until a new agreement was signed by
the company. Consequently, on August 7, 1975, the com-
pany signed a second contract with the town (supplemental

contract), and the bonds were issued later in the month. The supplemental contract primarily "clarified and amended" the original contract to provide that, for at least twenty years, the company's facility "shall be subject to the local real estate tax of the Town of Saugus in accordance with the laws of the Commonwealth of Massachusetts prior to the effective date of Chapter 500 of the Acts of 1975, except that during the three years covered by [the original contract] as to real estate taxes, the terms of said agreement shall apply."

The company's property was assessed at $24,401,500 as of January 1, 1976, and was taxed at that value for fiscal years 1977 through 1981. The company filed applications for abatements and appeals of these assessments for fiscal years 1977 through 1980,[1] which are pending before the Appellate Tax Board. The town argues that, under the contracts, the company cannot challenge $20 million of this assessment for the years 1977 to 1979. The Appellate Tax Board decided that determinations of the validity and interpretation of those contracts were beyond its jurisdiction.

The town subsequently filed a complaint for a declaratory judgment.[2] G. L. c. 231A, § 2. In its complaint, the town asked the court to find that the two agreements "are valid and enforceable against the defendant," and that they "require that the pending appeals before the Appellate Tax Board be limited to the issue of the lawfulness of that portion of the Town's assessment of all of [the company's] property which exceeds Twenty Million Dollars ($20,000,000)."

The judge below decided that the portions of the agreements intended to forestall the company's challenge to the first $20 million of the assessed value of its property for the three fiscal years, 1977 through 1979, are "illegal and unenforceable."[3] We agree.

---

[1] Subsequently, the company challenged its assessment for 1981.

[2] The parties agreed to stay the appeals pending before the Appellate Tax Board until the issues are resolved in this action.

[3] The judge made it clear that his declaration was limited to "the defendant's ability to seek abatement of taxes, and as to all other provisions

1. *Ability to challenge assessment.* The company claims that the contracts are illegal and unenforceable, because they prevent it from challenging $20 million of its assessment, thus potentially subjecting it to disproportionately high taxes.[4] The company supports its argument with the Massachusetts Constitution, Part II, c. 1, § 1, art. 4, which gives the Legislature the power "to impose and levy proportional and reasonable assessments, rates, and taxes." We have interpreted that section as requiring the imposition of equal tax rates and forbidding "'the imposition upon one taxpayer of a burden relatively greater or relatively less than that imposed upon other taxpayers.' See *Opinion of the Justices,* 332 Mass. 769, 777 [1955]." *Bettigole* v. *Assessors of Springfield,* 343 Mass. 223, 230 (1961).

The company claims that the contractual provisions precluding it from challenging its assessment violate this general rule. The fair cash valuation standard for real estate assessments "cannot be varied by public officers or by agreement of parties." *Waltham Watch & Clock Co.* v. *Waltham,* 272 Mass. 396, 412 (1930).

When contracts provide for waivers of tax appeals or tax exemptions, they must be entered into with the clear approval of the Legislature. Thus, we will not enforce such contracts without legislative approval. Cf. *Collector of Taxes of Boston* v. *National Shawmut Bank,* 259 Mass. 14,

---

of the agreement, no declaration is made." This determination extends only to the tax appeals for 1977 through 1979, and not to the 1980 and 1981 tax appeals. Thus, we do not reach the issue whether a real estate tax, or the excise tax enacted by St. 1975, c. 500, should be imposed on the company. Although the company asserts that the original and supplemental contracts are invalid, it states in its brief that it is not taking the position that the excise tax governs its abatement appeals. Furthermore, in raising the issue, the town failed to support its position by citation of statutes or case law, and thus "nothing in the brief reaches the level of argument" on this issue. *Commonwealth* v. *Bernier,* 366 Mass. 717, 719 (1975). See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975); *Lolos* v. *Berlin,* 338 Mass. 10, 14 (1958).

[4] In this case we are addressing the validity of the contracts to the extent that they prevent appeals of assessments, and not whether the assessments themselves are correct.

20 (1927). Because the Legislature has preempted the field of taxation, its approval is required. "The laws established by it cannot be waived or changed by municipalities or their officers. Such laws are and must be general in their operation. When the Legislature has covered the whole subject, there is no room for the exercise of authority by local officers. The town has no power to make a contract concerning that subject." *Southborough* v. *Boston & Worcester St. Ry.*, 250 Mass. 234, 239 (1924). "Moreover, what property is taxable and what is exempt is a subject covered by laws which are and must be general in their operation. They cannot be varied by a contract between the town and the taxpayer." *Assessors of Dover* v. *Dominican Fathers Province of St. Joseph*, 334 Mass. 530, 537 (1956).

However, despite clear authority prohibiting such contracts, the town presents several arguments in favor of the validity of the contractual provisions at issue. The town asserts that the Legislature has delegated the power to assess property to municipalities. Therefore, it argues, the town may contract with taxpayers to have them waive their right to challenge part of their assessment. The flaw in the town's argument is that an enforced waiver may allow municipalities to impose disproportionate tax burdens indirectly, through the taxpayers' inability to challenge an assessment. In the case before us, the town's position could result in the company's paying taxes in excess of those required by law.[5] The delegation of the power to assess does not negate general tax policies of the Commonwealth.

In addition, contrary to the town's assertion, the Legislature has not delegated to municipalities the power to make agreements such as those at issue here. The town states that G. L. c. 58A, § 6, and G. L. c. 59, § 64, allow agreements between assessors and taxpayers. These provisions, however, permit agreements on abatements of taxes only after

---

[5] The fact that the actual assessment was greater than the $20 million at issue here does not bear on our conclusion. See *Southborough* v. *Boston & Worcester St. Ry.*, 250 Mass. 234, 238-239 (1924).

an assessment has been made and an appeal has been filed. Moreover, neither of these statutes provides for an advance waiver of rights to appeal assessments.[6]

Furthermore, it is not clear that the contractual provisions at issue were designed or would operate as merely a waiver of the company's right to challenge $20 million of the assessed value of its property. We believe that the contractual arrangement was more than a simple waiver: it was intended to impose a minimum tax on the company. If the company's property is assessed for more than $20 million, but its value is actually less than that amount, the company would be illegally forced to pay more taxes than other similarly situated taxpayers.[7]

Although the town argues that the company would not have been forced to pay taxes on a $20 million assessment if the property had been assessed at a lesser value,[8] its statements elsewhere belie that view. The town has referred to the arrangement in its brief as a "minimum assessment," which would provide the town with a "method of stabilizing, for only three years, revenue that the Town was already authorized to levy and collect." Furthermore, the town had earlier called the provision a "minimum requirement" to provide it with "the equivalent of a million dollars net for 20 years," or a "guarantee of tax payment on $20,000,000." These statements demonstrate that the town

---

[6] The town also argues that the Legislature has demonstrated its approval of the contracts through its enactment of St. 1975, c. 500, which alters the method of taxation for solid waste disposal facilities. The grandfather clause for that statute permits continuation of the former tax method for the duration of "negotiated agreements containing arrangements relating to real estate taxes or assessments with a city or town in which the facility is located." This language may refer to contracts providing for tax exemptions with legislative approval, see *Opinions of the Justices*, 365 Mass. 665, 675 (1974), or to those contracts based on a proper appraisal of the property. It certainly does not authorize the contractual provisions at issue here.

[7] In this situation, any overpayment by the company could become evident in 1980 and 1981, as the contracts do not restrict the company from challenging its assessments after 1979.

[8] On this theory, the company could not challenge an excessive assessment below $20 million.

may have enforced the agreement as requiring a minimum tax, rather than as a mere waiver of the right to appeal designed to free the town from the cost of abatement appeals.[9]

The agreements therefore dictate the imposition of a tax regardless of the true value of the property. The situation is analogous to *Southborough* v. *Boston & Worcester St. Ry.*, 250 Mass. 234 (1924), in which the defendant agreed to pay the plaintiff $900 annually in exchange for permission to construct a street railway on particular public ways. The court interpreted this payment to be part of the excise tax. "If such excise was less than $900, the company was to be credited with the amount thereof on account of such annual payment, and if the excise exceeded such sum in any year, then such excess was to be paid by the company to the town." *Id.* at 236-237. Although the excise tax had been repealed for the years in question, the judge decided the case on the ground that the contract was "invalid and non-enforceable," *id.* at 241, because it "relates to the subject of taxation, which in essence is and must be authorized by a general law," and not by a contract between the taxpayer and the town, *id.* at 240.

*Southborough* controls the case before us because, as we have said, the waiver of the right to appeal operates as the imposition of a fixed tax regardless of the actual value of the property.[10] We therefore conclude that the provisions in

---

[9] If the town wished to ensure a minimum payment from the company, it could have made an arrangement with the company for a contribution in lieu of taxes to defray some of the expense its facility might impose on the town, see *Morrison* v. *Selectmen of Weymouth*, 279 Mass. 486, 493-494 (1932); *Southborough* v. *Boston & Worcester St. Ry.*, 250 Mass. 234, 240 (1924), provided such an arrangement would not be an improper precondition to a bond issue under G. L. c. 40D. The company argues that the contracts are such improper preconditions, but we need not reach that issue. See part 3, *infra*.

[10] The town asserts that this case should be controlled by *Town Planning & Eng'g Assocs.* v. *Amesbury Specialty Co.*, 369 Mass. 737 (1976). We disagree. That case established a number of factors which should be considered in determining whether a violation of a statute in the performance of a contract should render the contract unenforceable on the ground of illegality. The case before us concerns instead whether the contractual

the original and supplemental contracts, which prevent the company from challenging $20 million of its property tax assessment, are illegal and unenforceable.

2. *Estoppel and laches.* The town suggests that the judge erred in deciding that neither estoppel nor laches bars the company's assertion of the defense of illegality. We believe the record supports the judge's conclusion.

The company should not be estopped, because it does not appear that the town "has been induced by the conduct of [the company] to do something different from what otherwise would have been done and which has resulted to [its] harm and that the other knew or had reasonable cause to know that such consequence might follow. But the doctrine of estoppel is not applied except when to refuse it would be inequitable." *Boston & Albany R.R.* v. *Reardon,* 226 Mass. 286, 291 (1917). The company's claim may not be barred by laches either, because there was no delay by the company in asserting its claims which prejudiced the town. *Three Sons, Inc.* v. *Phoenix Ins. Co.,* 357 Mass. 271, 278 (1970).

In this case, the only act the town took which it might otherwise not have taken was to issue the bonds, and it has alleged no real harm to it resulting from the conduct. Furthermore, there is evidence in the record supporting the company's claim that it asserted the illegality of the contracts before signing them. The town claims that it was also harmed by having collected taxes from the company, which it has used for its expenses. However, as the judge found, this prejudice to the town is the same prejudice it faces from any application for abatement before the Appellate Tax Board. Thus, we conclude that these defenses are without merit.

3. *Conclusion.* We do not reach other questions presented concerning the validity of the contracts. The trial judge determined that there was no justiciable controversy be-

provisions are themselves illegal and not whether the performance of the contract violates a statute.

tween the parties regarding other contractual provisions, and found that those provisions have been performed.[11] Although the company did not appeal that decision, it requests us to invalidate the contracts in their entirety as illegal preconditions to the issuance of bonds under G. L. c. 40D. We need not address that issue. "Although a party may defend a judgment on any ground asserted in the trial court, failure to take a cross appeal precludes a party from obtaining a judgment more favorable to it than the judgment entered below." *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 43 n.5 (1977).

Therefore, we affirm the judgment of the Superior Court that the contractual provisions intended to prohibit the company from challenging up to $20 million of its assessment are invalid and unenforceable.

*Judgment affirmed.*

---

[11] In his opinion, the judge concluded that "[o]ther clauses of the aforesaid documents, to the extent requiring performance by each party, have in fact been performed; neither party seeks relief on account of such performance, and declaratory judgment as to such clauses would amount to an academic exercise."